# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-3097

JOYCE TAKLE,

*Plaintiff-Appellant*,

v.

UNIVERSITY OF WISCONSIN HOSPITAL
AND CLINICS AUTHORITY,

*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04-C-0217-S—**John C. Shabaz**, *Judge*.

_____

ARGUED JANUARY 7, 2005—DECIDED MARCH 30, 2005

_____


Before POSNER, RIPPLE, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. Joyce Takle filed suit in a federal district court in Wisconsin against the University of Wisconsin Hospital and Clinics Authority, which owns and operates the University of Wisconsin Hospital and Clinics in Madison, Wisconsin. (For the sake of brevity, we'll usually refer to both the Authority and the University of Wisconsin Hospital and Clinics as "the hospital.") A former nurse at the hospital, Takle sought damages for violation of

her rights under Title I of the Americans with Disabilities Act, the alleged violation consisting of the hospital's having treated her as if she were disabled by diabetes when she was not. 42 U.S.C. §§ 12102(2)(C), 12112(a); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489-90 (1999); *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001). The district judge dismissed the suit on the hospital's motion, ruling that the hospital is an arm of the State of Wisconsin and is therefore immune from suit in federal court unless it has consented to be sued there, which it has not. Title I of the ADA does not abrogate state sovereign immunity. *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 360 (2001); *Erickson v. Board of Governors of State Colleges & Universities for Northeastern Illinois University*, 207 F.3d 945, 952 (7th Cir. 2000).

After the break from England but before the adoption of the Constitution, the states had sovereign immunity from suit. The framers did not intend to abrogate that immunity, although they failed to say so in the Constitution. They should have, for as a result of *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 467-68 (1793), which held that a citizen of one state could sue another state in a federal court, the Eleventh Amendment had to be added to the Constitution, precluding such suits. No negative inference was intended by the narrow wording of the amendment; that is, there was no intention of authorizing the citizen of a state to sue his own state in federal court—no intention, in other words, of abrogating the states' sovereign immunity. E.g., *Federal Maritime Comm'n v. South Carolina State Ports Authority*, 535 U.S. 743, 752-53 (2002); *Alden v. Maine*, 527 U.S. 706, 723-24 (1999); *Seminole Tribe v. Florida*, 517 U.S. 44, 69-70 (1996).

But what exactly is the "state"? The defendant in this case is, as we are about to see, a hybrid entity; it has characteristics of both a state agency and a private foundation. Where

on the public-private spectrum to locate it depends on the purpose of the doctrine of sovereign immunity, and that purpose is obscure because "sovereignty" is an obscure concept when applied to a state of the United States. Is Wisconsin's "sovereignty" impaired if the hospital is suable in a federal court? It would be if the hospital were financed by the state, e.g., *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 48-51 (1994); *Kashani v. Purdue University*, 813 F.2d 843, 845 (7th Cir. 1987); *Cash v. Granville County Board of Education*, 242 F.3d 219, 223-24 (4th Cir. 2001), so that any judgment against it would be paid out of state funds, unless the state had taken out some form of liability insurance, *Regents of University of California v. Doe*, 519 U.S. 425, 430-31 (1997)—but that would not negate its liability; it would be the premise of its liability, for unless it were liable it wouldn't need liability insurance.

The hospital is not financed by the state, however, and this leaves us rather at sea. We are mindful of the cases that say that the purpose of sovereign immunity is to protect not only the state's fiscal independence but also its "dignity." E.g., *Federal Maritime Comm'n v. South Carolina State Ports Authority, supra*, 535 U.S. at 765-66; *S.J. v. Hamilton County*, 374 F.3d 416, 420-22 (6th Cir. 2004). But the notion of state dignity is difficult to translate into an operational legal standard.

About all that is clear on the level of doctrine is the futility of the hospital's pointing out that a judgment against it might impair its ability to continue to provide benefits that reduce the burdens on the state treasury; for example, the hospital provides charity care that the state would otherwise be under strong pressure to provide. Were the loss of a benefit to the state enough to confer sovereign immunity on the provider of the benefit, an ordinary taxpayer would be covered by sovereign immunity, at least if a judgment

against him would be deductible from state income tax but not taxable to a state-resident recipient of the judgment; for then the state treasury would be diminished by the amount of the tax saving. It is no surprise that the Supreme Court has rejected the state-benefit theory of sovereign immunity. *Hess v. Port Authority Trans-Hudson Corp.*, *supra*, 513 U.S. at 50-51 and n. 21.

Until 1996 the hospital was a part of the University of Wisconsin, a state university conceded to be part of the state. That year the legislature, having the previous year created the University of Wisconsin Hospital and Clinics Authority, 1995 Wis. Laws 27, § 6301 (codified at Wis. Stat. § 233.01 *et seq.*), spun off the hospital to the Authority. It did so because the hospital was finding it difficult to compete with private hospitals. It was hampered by restrictions imposed by state law on hiring, tenure, and compensation of state employees and on the making of state contracts relating to construction and procurement.

The hospital—which is described in a report titled *An Evaluation: University of Wisconsin Hospital and Clinics Authority* (June 2001), prepared (as required by Wis. Stat. § 13.94) for the Wisconsin legislature by Wisconsin's Joint Legislative Audit Committee, as an "independent, nonprofit entity"—is authorized by its organic statute to sue and be sued in its own name, to own property and borrow against it, to make contracts, including employment contracts, to issue bonds, and, in short, to operate as a private hospital operates. Wis. Stat. § 233.03. And the state is not liable for the hospital's debts, at least if it doesn't prevent the hospital from discharging those debts. § 233.23. So, should the hospital default on its bonds, the state would not be required to bail out the bondholders. §§ 233.17(1), 233.22.

So far, there is nothing to indicate that the hospital should be viewed as a part of state government. So far, we are

describing the privatization of a formerly public function. There is nothing inherently governmental about a hospital. Most hospitals are private, though that cannot be the complete test; there are more private security guards in the United States than there are police officers, but it is hard to imagine a state privatizing the state police. Wisconsin's own courts would classify the hospital as private; we know this from a comparison between *Walker v. University of Wisconsin Hospitals*, 542 N.W.2d 207, 209-12 (Wis. App. 1995) (reversed in part on other grounds in *Bicknese v. Sutula*, 660 N.W.2d 289 (Wis. 2003)), which held that the hospital authority's predecessor was an arm of the state, and *Majerus v. Milwaukee County*, 159 N.W.2d 86, 87-88 (Wis. 1968), which held that the state's Armory Board was not part of state government—held that because of features of the board equally possessed by the hospital, such as financial autonomy and the authority to sue and be sued in its own name.

It would be nice if the hospital's organic statute stated outright that the hospital is a private entity rather than an arm of the state—that would resolve the issue—but it does not say that. Not quite, at any rate. The hospital points out that some members of its board of directors are appointed by the governor and others are members by virtue of holding a public office, such as the dean of the University of Wisconsin's medical school. Wis. Stat. § 233.02(1). But as we noted recently in another case involving whether an entity was state or private, *Illinois Clean Energy Community Foundation v. Filan*, 392 F.3d 934, 937-38 (7th Cir. 2004), the power to appoint is not the power to control. See also *Auer v. Robbins*, 519 U.S. 452, 456 n. 1 (1997); *Hess v. Port Authority Trans-Hudson Corp.*, *supra*, 513 U.S. at 47-48; *Fresenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico & Carribean Cardiovascular Center Corp.*, 322 F.3d 56, 68 (1st Cir. 2003); *Mancuso v. New York State Thruway Authority*, 86 F.3d 289,

296 (2d Cir. 1996); *Christy v. Pennsylvania Turnpike Comm'n*, 54 F.3d 1140, 1149-50 (3d Cir. 1995); *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1427 (9th Cir. 1991). Especially when that power is diffused among different public officials who may hold quite different views of how the entity should conduct itself.

Certain other public-entity characteristics of the hospital are merely incidental to the transition from public to private, rather than being indicative of continued state control. For example, most of the hospital's employees continue to be deemed state employees, though stripped of the usual privileges and protections of such employees. Their continued classification as state employees mainly enables them to remain in the state's pension system. That's simpler than creating a new pension system that would have to be integrated with the old one because many of the employees acquired vested rights under the old. It may also enable the hospital to bargain with the employees without subjecting itself to the jurisdiction of the National Labor Relations Board, 29 U.S.C. § 152(2); *NLRB v. Natural Gas Utility District of Hawkins County*, 402 U.S. 600, 604-05 (1971), further assuring continuity with the hospital's labor set-up before the spin off.

Ignoring such really minor strings as the subjection of the board of directors to the state's open-meeting laws, see *Durning v. Citibank, N.A.*, *supra*, 950 F.2d at 1427, we are left to consider the significance of the twin facts that the state owns the hospital's existing buildings, although the hospital can acquire additional buildings that it will own, and that it's required by state law to finance the university's medical school and to provide health services required by the state. Neither point is significant. Many private entities operate on public land or in public buildings; consider concessionaires in airports. And we noted earlier that the fact that an entity

provides, willingly or not, benefits to the state does not make it the state; here we add that the hospital was financing the university's medical school before it was spun off, so naturally the state requires it to continue to do so. The state is not going to sell a valuable property without requiring compensation in some form, in this case continued financial support of the state's medical school. Similarly, the provision of mandated health services is a subsidy demanded by the state in exchange for privatizing the hospital.

What we have, then—making this indeed much like the *Illinois Clean Energy Community Foundation* case—is a state's creation of a private entity, with the state using its leverage as the creator of the entity to insist that it serve the state's interests as well as its own. The strings that tie the hospital to the state are found in many cases in which a state decides to privatize a formerly state function. They do not require that privatization be treated as a farce in which the privatized entity enjoys the benefits both of not being the state and so being freed from the regulations that constrain state agencies, and of being the state and so being immune from suit in federal court.

Our conclusion that the hospital does not have sovereign immunity is in accord with the other decisions that deal with similar hybrid entities. See *United States ex rel. Barron v. Deloitte & Touche, L.L.P.*, 381 F.3d 438, 439-42 (5th Cir. 2004); *United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1147-48 (9th Cir. 2004); *Fresenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico & Caribbean Cardiovascular Center Corp., supra*, 322 F.3d at 68-75; *Durning v. Citibank, N.A., supra*, 950 F.2d at 1423-28. (*Fresenius* is particularly close.) But we must consider the bearing of our decision in *Thiel v. State Bar of Wisconsin*, 94 F.3d 399 (7th Cir. 1996), the principal decision on which the district court relied. In the course of ruling that the Wisconsin State Bar is

an arm of the state, the court in *Thiel* said that the most important factors to consider in deciding whether a hybrid entity is the state for purposes of sovereign immunity are the extent of state control and whether the entity was acting as the state's agent in conducting the activity that gave rise to the suit (in the present case that activity is dealing with the federal disability rights of the hospital's employees); it said that the impact of the relief sought by the plaintiff on the state treasury was much less important because sovereign immunity extends to suits for injunctive relief as well as damages. *Id.* at 401; see also *Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396, 1402 (7th Cir. 1993).

The first two factors are certainly sound and the decision in *Thiel* is unquestionably correct. The state bar is a limb of the Supreme Court of Wisconsin and the rule challenged in the case dealt with the method of determining the dues paid by the members of the bar. Moreover, though enforced by the state bar, the rule had been promulgated by the supreme court. Had the rule been enjoined, the bar's performance of duties directly related to the administration of justice would have been impeded. See also *Kaimowitz v. Florida Bar*, 996 F.2d 1151, 1155 (11th Cir. 1993) (per curiam); *Lewis v. Louisiana State Bar Ass'n*, 792 F.2d 493, 497-98 (5th Cir. 1986); *Ginter v. State Bar*, 625 F.2d 829, 830 (9th Cir. 1980) (per curiam).

In such a case, the fact that a judgment against the state treasury is not sought is of no importance. But *Thiel* does not hold that it is *never* of any importance. The issue was not presented; and to say that the effect of a judgment on state finances is never important would be inconsistent with numerous decisions of the Supreme Court and the courts of appeals, including this court. E.g., *Regents of University of California v. Doe*, *supra*, 519 U.S. at 430; *Hess v. Port Authority Trans-Hudson Corp.*, *supra*, 513 U.S. at 48-49; *Luder v.*

*Endicott*, 253 F.3d 1020, 1023 (7th Cir. 2001); *Kashani v. Purdue University*, *supra*, 813 F.2d at 845; *Beentjes v. Placer County Air Pollution Control District*, 397 F.3d 775, 778 (9th Cir. 2005); *United States ex rel. Barron v. Deloitte & Touche, L.L.P.*, *supra*, 381 F.3d at 440; *Cash v. Granville County Board of Education*, *supra*, 242 F.3d at 223-24. In fact though not in legal fiction, damages suits and injunctive suits against a state are treated differently. The former are barred, but the latter are permitted under the doctrine of *Ex parte Young* by the device of the plaintiff's naming as the defendants the responsible state officials rather than the state itself; for pertinent illustrations see *Board of Trustees of University of Alabama v. Garrett*, *supra*, 531 U.S. at 374 n. 9; *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 606 (7th Cir. 2004); *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 912-13 (7th Cir. 2003). Such a suit has the identical effect as enjoining the state itself would have, and this shows that on a practical level the law treats injunctive actions against a state differently from damages actions. In a case such as this, in which a privatized "independent" entity for which the state bears no financial responsibility is being sued over its personnel policies, which are entirely within its discretion, the fact that the suit can have no adverse effect on the state's finances is highly relevant.

The grant of the motion to dismiss is REVERSED and the case REMANDED.

A true Copy:

      Teste:

                                _____

                         *Clerk of the United States Court of*
                             *Appeals for the Seventh Circuit*