# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ELENA M. DEL CAMPO, on behalf
of herself and all others similarly
situated; LOIS ARTZ; MIRIAM
CAMPOS; LISA JOHNSTON; ASHORINA
MEDINA,
             *Plaintiffs-Appellees,*

            v.

GEORGE KENNEDY, District
Attorney; DON R. MEALING; BRUCE
D. RAYE; ACCS ADMINISTRATION,
INC.; R. D. DAVIS; GREEN, Mister;
KRAMER, Mister; LOPEZ, Mrs.;
FULFILLMENT UNLIMITED, INC.;
FUNDAMENTAL PERFORMANCE
STRATEGIES; LYNN R. HASNEY;
FUNDAMENTALS, INC.,
             *Defendants,*

            and

AMERICAN CORRECTIVE COUNSELING
SERVICES, INC.,
             *Defendant-Appellant.*

No. 07-15048

D.C. No.
CV-01-21151-JW

OPINION

Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, Presiding

Argued and Submitted
September 27, 2007—San Francisco, California

Filed February 6, 2008

1747

Before: John R. Gibson,* A. Wallace Tashima, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

---

*The Honorable John R. Gibson, Senior United States Circuit Judge for
the Eighth Circuit, sitting by designation.

**COUNSEL**

Charles D. Jenkins (argued), of Jenkins Goodman Neuman & Hamilton LLP, San Francisco, California, Kimbley A. Kearney and Edward M. Kay, of Clausen Miller P.C., and David L. Hartsell, of McGuire Woods LLP, Chicago, Illinois, for the defendant-appellant.

Deepak Gupta (argued) and Brian Wolfman, of the Public Citizen Litigation Group, Washington, DC, Paul Arons, of the Law Office of Paul Arons, Friday Harbor, Washington, and O. Randolph Bragg, of Horwitz, Horwitz & Associates, Chicago, Illinois, for the plaintiffs-appellees.

John R. Poyner, Colusa, California, for *amicus curiae* California District Attorneys Association.

Robert J. Hobbs, Boston, Massachussetts, for *amici curiae* National Consumer Law Center, Inc., and National Association of Consumer Advocates.

**OPINION**

BERZON, Circuit Judge:

Our question is whether a private company contracting with a district attorney for services related to a diversion program

is entitled to state sovereign immunity. We decide that it is not.

## I.

American Corrective Counseling Services ("ACCS"), a private corporation, contracted with the District Attorney for Santa Clara County, California, (the "DA") to run a bad check diversion program. Its conduct of that program generated this litigation.

California criminalizes the making, drawing, uttering, or delivery of any check, draft, or money order "willfully, with intent to defraud" and with knowledge that insufficient funds are available. CAL. PENAL CODE § 476a(a). California has authorized a DA to create a bad check diversion program in which the DA may agree not to prosecute for bad check offenses if the potential defendant provides restitution to the victim of the bad check, completes a course, and pays applicable collection fees. CAL. PENAL CODE §§ 1001.60-67. Such a program "may be conducted by the [DA] or by a private entity under contract." CAL. PENAL CODE § 1001.60. ACCS has built its business around such contracts, based upon the collection of program fees from participants in the diversion program, *id.* at § 1001.65, which ACCS shares with the DA.

This case grows out of ACCS's contract with the Santa Clara County DA. Under that contract, ACCS is entitled to collect a $100 class fee, 60% of all administrative fees, and various additional fees and late charges.[1] In exchange for these fees, ACCS runs nearly every aspect of the bad check program. It provides "daily management of all clerical and accounting functions," including sending "demand notices to suspected bad check writers, collection and disbursement of victim restitution and administrative revenue and all financial

---

[1]Whether these fees are authorized by statute is in dispute in this litigation and is a question that we do not decide.

reporting." It provides staff to contact county businesses about the program, runs financial education courses for bad check writers, and maintains all program files. The DA provides "intake criteria" — a two-page checklist — designating the checks that are appropriate for the program. The contract imposes no obligation upon the DA initially to decide which overdrawn checks should be referred to the program because they appear to indicate that a crime has been committed, requiring only that the DA "review all cases transferred by ACCS [to the DA] for failure to comply" with its program.

The contract makes clear that ACCS is an "***INDEPENDENT CONTRACTOR***" (emphasis in original) and that "[n]othing within this agreement shall be construed as creating a relationship of employer or employee, or principal and agent, between the County of Santa Clara and ACCS" or its employees or agents. ACCS is required to indemnify the county, and must carry its own insurance.

ACCS operated the program aggressively. When Elena del Campo bounced a check for $95.02, ACCS sent her a letter on the Santa Clara County DA's stationary, purporting to be from the DA's office, warning that his office had received "an INCIDENT REPORT *alleging that you have violated Penal Code 476(a) of the California State Statute: Passing a Worthless Check*" (emphasis in original). It claimed that "*YOU MAY AVOID A COURT APPEARANCE if you agree to enroll* [in the bad check program]" (emphasis in original) and demanded, after taking into account ACCS's various fees, $265.02 in payment.

When del Campo sent payment only for the amount of her check, she received a second letter entitled "Notice of Failure to Comply" and warning that "[y]our failure to respond may now result in the filing of this incident report by the District Attorney in MUNICIPAL COURT!" (emphasis in original).

Instead of paying, del Campo filed this action against the DA, ACCS, and several related companies and officials.[2]

She alleged equal protection and due process violations under 42 U.S.C. § 1983, various violations of the California Constitution, violations of the California Unfair Business Practices Act ("CUBPA"), CAL. BUS. & PROF. CODE §§ 17200 *et seq*., and violations of the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq*.

The district court dismissed the causes of action under § 1983 and the California Constitution but allowed the FDCPA[3] and CUBPA causes of action to go forward.

The litigation was then stayed for several years because of an injunction issued by a district court hearing a similar case in the Southern District of Iowa. *See generally Liles v. American Corrective Counseling Services*, Civ. No. 4-00-CV-10497 (S.D. Iowa). During that time, new plaintiffs filed suit against ACCS and the Santa Clara County DA in the Northern District of California. After the stay was lifted in 2005, the second Santa Clara County case was consolidated with del Campo's in 2006 (we collectively refer to the plaintiffs as "del Campo"). The consolidated complaint realleges all the causes of action in the original complaint and adds allegations of conversion, negligent misrepresentation, and fraudulent misrepresentation.

The defendants then moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim. Both ACCS and the DA claimed state sovereign immunity. The district court declined to extend such immunity.

---

[2]Del Campo filed her suit as a class action. A class has not yet been certified.

[3]The FDCPA creates civil liability for debt collectors who fail to comply with its provisions and grants federal courts jurisdiction to hear such cases. *See* 15 U.S.C. § 1692k.

The district court's decision turned in large part on its characterization of the bad check program. California DAs serve both state and county functions: They act as state officials, and so possess Eleventh Amendment immunity, when "acting in [their] prosecutorial capacity." *Weiner v. San Diego County*, 210 F.3d 1025, 1028 (9th Cir. 2000); *see also Pitts v. County of Kern*, 949 P.2d 920 (Cal. 1998). The district court held that the bad check diversion program was one of several county-based diversion programs created by the California legislature, *see generally Davis v. Municipal Court for the S. F. Judicial Dist.*, 757 P.2d 11 (Cal. 1988) (describing such programs), and that the Santa Clara County DA's role in the program was administrative. It therefore held that the DA acted in his county capacity while administering the program and so was not entitled to state sovereign immunity. The court concluded, however, that its earlier dismissal of the § 1983 and California constitutional causes of action was *res judicata* and dismissed them. Because the DA faced only those causes of action, the court dismissed the DA from the suit.[4]

The district court's characterization of the bad check program also controlled its analysis of ACCS's claim of state sovereign immunity. ACCS argued that it acted as an arm of the state when implementing the diversion program. As the court had "determined that the diversion program in Santa Clara County is a county program and not a state program," it held that "ACCS's involvement in the diversion program cannot be a central function of the state government" and denied immunity.

ACCS timely appealed the district court's immunity decision.[5]

---

[4]The propriety of that ruling is not before us.

[5]Del Campo also appealed, but a motions panel of this court dismissed her appeal, noting that the district court's ruling had not disposed of all of her causes of action and the district court had not certified her appeal pursuant to Fed. R. Civ. Pro. 54(b). *See Del Campo v. Kennedy*, No. 07-15048 (9th Cir., June 13, 2007); *see also Chacon v. Babcock*, 640 F.2d 221, 222 (9th Cir. 1981) (discussing Rule 54(b)).

## II.

ACCS contends that it is entitled to state sovereign immunity, even though it is a private entity. For the second time in four years "we decline the invitation to expand state sovereign immunity dramatically by extending it to corporate actors," *United States ex rel. Ali v. Daniel, Mann, Johnson, & Mendenhall* ("*DMJM*"), 355 F.3d 1140, 1147 (9th Cir. 2004), or to private entities generally.

### 1.  Jurisdiction and Standard of Review

There has been no final judgment in this case. We nonetheless have "jurisdiction to review the district court's denial of . . . Eleventh Amendment immunity under the collateral order doctrine." *Schulman v. California (In re Lazar)*, 237 F.3d 967, 974 (9th Cir. 2001) (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993)).

Del Campo argues that we should decline to exercise jurisdiction under the collateral order doctrine because *Puerto Rico Aqueduct and Sewer Authority* in fact concerns "States and *state* entities possessing a claim to share in that immunity," 506 U.S. at 147 (emphasis added), and ACCS, as a private company, is manifestly not a state or state entity. It is true that the " 'narrow exception' [of the collateral order doctrine] should stay that way and never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error at any stage of the litigation may be ventilated." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (internal citations omitted). Appeals from denial of sovereign immunity nonetheless fall within that narrow exception. Whether the immunity reaches beyond "states and state entities" is the substantive issue we face,

which we may not prejudge by denying jurisdiction to decide it.[6]

"The existence of sovereign immunity is a question of law reviewed de novo." *DMJM*, 355 F.3d at 1144. "Under the law of this circuit, an entity invoking Eleventh Amendment immunity bears the burden of asserting and proving those matters necessary to establish its defense." *In re Lazar*, 237 F.3d at 974 (internal quotation omitted).

### 2.   Analysis

ACCS argues for immunity on the ground that the DA acted in his state capacity in administering the program and that it, therefore, is an arm of the state entitled to immunity. As the DA is no longer in this suit, we are reluctant to characterize his role or determine whether he would have been entitled to sovereign immunity had he remained in this case. As it turns out, we need not address that question.[7] Affirming the district court on a different ground, we hold that even if the DA acted in a state capacity in administering the program, ACCS would not be entitled to state sovereign immunity.

As we discuss below, the analysis provided in *DMJM*, 355 F.3d at 1146-48, demonstrates why private entities' claims of state sovereign immunity must fail. To the extent that *DMJM* appeared to leave any analytic distance, as ACCS claims, between ACCS's case and that of the private contractor denied immunity in *DMJM*, we close that gap today. Extending state sovereign immunity to private entities is, as we now make clear, not supported by our law, by relevant Supreme Court cases, or by the cases of the other circuits to have considered similar questions.

---

[6]As we explain below, however, such appeals are likely to be summarily affirmed if brought by private entities.

[7]Because we do not inquire into the DA's role, we deny as irrelevant the request for judicial notice of materials concerning that question made by amicus California District Attorneys Association.

### a.    Supreme Court Cases

[1] State sovereign immunity, rooted deeply in our federal structure, is strong medicine. *See Alden v. Maine*, 527 U.S. 715, 712-27 (1999) (recounting the history of state sovereign immunity and of the Eleventh Amendment). The phrase "Eleventh Amendment immunity," often used in lieu of "state sovereign immunity" in federal cases, *see, e.g.*, *Puerto Rico Aqueduct & Sewer Auth.*, 506 U.S. at 144, is "something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment." *Alden*, 527 U.S. at 713. Instead, immunity is " 'a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution and which they retain today[,] except as altered by the plan of the Convention or certain constitutional amendments.' " *N. Ins. Co. v. Chatham County, Ga.*, 547 U.S. 189, 193 (2006) (quoting *Alden*, 527 U.S. at 731) (alteration omitted). "The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities." *Fed. Mar. Comm'n v. S. C. State Ports Auth.*, 535 U.S. 743, 760 (2002). In accord with this purpose, state sovereign immunity is also intended to protect state treasuries from suit. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 38, 39-40 (1994).

[2] Recognizing the sweep and power of the doctrine, the Supreme Court has been cautious in extending state sovereign immunity even to many state-created and quasi-governmental entities. State sovereign immunity, for instance, "does not extend to counties and similar municipal corporations," even though they share some portion of state power. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). The Court has also declined to grant state sovereign immunity to some Compact Clause entities even though they may be "exercising a specially aggregated slice of state power," cautioning that it could not "accept such an expansive reading of the Eleventh Amendment." *Lake Country Estates,*

*Inc. v. Tahoe Reg'l Planning Auth.*, 440 U.S. 391, 400-01 (1979). In the Compact Clause context, the Court has expressed particular concern regarding extending sovereign immunity to entities whose "political accountability is diffuse," because "they lack the tight tie to the people of one State an instrument of a single State has." *Hess*, 513 U.S. at 42; *see also id.* ("In sum, within any single State in our representative democracy, voters may exercise their political will to direct state policy; bistate entities created by compact, however, are not subject to the unilateral control of any one of the States that compose the federal system.").

**[3]** Given this background we should be extremely hesitant to extend this fundamental and carefully limited immunity to private parties whose only relationship to the sovereign is by contract. A contractor like ACCS may perform some functions for the state, but is certainly more removed from state power, and from democratic control, than a county or a Compact Clause organization. Private entities fit even less readily than those bodies into the theoretical framework supporting state sovereign immunity. It would thus be strange to award private entities sweeping immunity from suit.

Our reluctance to expand sovereign immunity to private entities is reinforced by the consideration that the recognition of state sovereign immunity with regard to an entity results in restrictions on federal legislative as well as judicial authority with regard to that entity, including "restrictions on the power of Congress, acting under certain Article I powers, to create privately enforced federal causes of action against the [entity]." *Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico & the Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 63 (1st Cir. 2003) (citing *Seminole Tribe v. Florida*, 517 U.S. 44 (1996)). So limiting Congress's power to regulate a private company simply because it has contracted with a state would radically alter the bounds and nature of federal authority, while, at the same time, calling into question the distinctive nature of states as sovereign entities.

In short, as the First Circuit rightly warned in *Fresenius*:

> where [a state-structured] entity claims to share a state's sovereignty and the state has not clearly demarcated the entity as sharing its sovereignty, there is great reason for caution. It would be every bit as much an affront to the state's dignity and fiscal interests were a federal court to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty.

322 F.3d at 63.

### b.   Ninth Circuit Cases

In accord with these compelling considerations, our cases confirm that private entities have no place within the state sovereign immunity legal framework. The usual issue in our cases has been whether a governmental entity is an arm of the state or is better characterized as part of another level of government. Our inquiry has been careful, and we have often declined to extend immunity even to governmental entities.[8]

[4] The factors we apply in the state sovereign immunity inquiry, drawn from *Mitchell v. Los Angeles Community Col-*

---

[8]*See, e.g.*, *Beentjes v. Placer County Air Pollution Control Dist.*, 397 F.3d 775, 786 (9th Cir. 2005) (Placer County Air Pollution Control District is not immune); *Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1189 (9th Cir. 2003) (Alaska school district is not immune); *Savage v. Glendale Union High Sch.*, *Dist. No. 205*, 343 F.3d 1036, 1040 (9th Cir. 2003) (Arizona school district is not immune); *Eason v. Clark County Sch. Dist.*, 303 F.3d 1137, 1144 (9th Cir. 2002) (Nevada school district is not immune)*; Schulman v. California (In re Lazar)*, 237 F.3d 967, 981, 983 (9th Cir. 2001) (California State Water Resources Control Board and California Underground Storage Tank Cleanup Fund are arms of the state); *Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 5 F.3d 378, 382 (9th Cir. 1993) (immunity for state-owned railroad created by statute); *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1428 (9th Cir. 1991) (no immunity for the Wyoming Community Development Authority).

*lege Dist.*, 861 F.2d 198, 201 (9th Cir. 1988), are thus designed to discriminate between governmental bodies, not to determine whether private entities are arms of the state. *See id.* ("To determine whether a *governmental agency* is an arm of the state, the following factors must be examined . . . .) (emphasis added) (citing *Jackson v. Hayawaka*, 682 F.2d 1344, 1350 (9th Cir. 1982)). Under *Mitchell*, courts look to five factors: "(1) whether a money judgment would be satisfied out of state funds; (2) whether the entity performs central governmental functions; (3) whether the entity may sue or be sued; (4) whether the entity has the power to take property in its own name or only in the name of the state; and (5) the corporate status of the entity." *DMJM*, 355 F.3d at 1147 (citing *Mitchell*, 861 F.2d at 201)). This test was not meant for, is ill-adapted to, and loses its utility when performed upon a private entity. The negative result it generates will always be the same: Only the second *Mitchell* factor could *ever* cut in favor of granting a private entity sovereign immunity, as *DMJM*, our sole case to apply the *Mitchell* factors to a private entity, amply demonstrates.[9]

In *DMJM*, a private contractor repairing state university buildings asserted state sovereign immunity, deriving from its state contract, against a *qui tam* action under the False Claims Act, 31 U.S.C. § 3729 *et seq. See DMJM*, 355 F.3d at 1144. *DMJM* rejected the contractor's argument that "common law agency principles" could transmit sovereignty by contract, as such an "analysis would lead to the surprising result that private contractors acting on behalf of the state are immune . . . while local governments performing local government func-

---

[9] Our cases extending "regulatory immunity" to "self-regulatory organizations" acting under the aegis of statutorily-delegated authority, such as the National Association of Securities Dealers, are not to the contrary. Those cases are rooted in policy considerations and make clear that "[a]s a private corporation, [such an entity] does not share in . . . sovereign immunity." *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1214 (9th Cir. 1998) (quoting *Barbara v. N.Y. Stock Exch.*, 99 F.3d 49, 59 (2nd Cir. 1996)).

tions are not." *Id.* at 1146. Instead, *DMJM* applied *Mitchell* to determine whether the contractor was an arm of the state. Doing so, *DMJM* "assume[d]" that the contractor was performing a central government function and so fulfilled the second *Mitchell* factor. *Id.* at 1147. But "all other factors weigh[ed] against granting DMJM sovereign immunity," *id.*, as the state had no legal obligation to pay the contractor's debts, and, as a private company, the contractor's "corporate status" was clearly private and it could, of course, sue and be sued and take property in its own name. *Id.* at 1147-48.[10] The contractor therefore could not claim immunity. *Id.* at 1148.

**[5]** Given *DMJM*, there is no reason to apply *Mitchell* every time a private entity under contract with the state asserts state sovereign immunity, as immunity will invariably be denied under that test. In each case, such an entity will fail at least four of the five *Mitchell* factors, and the possibility that it has contracted to perform a central governmental function will not be sufficient to convey immunity. *See DMJM*, 355 F.3d at 1148 (citing *Durning*, 950 F.2d at 1426-28, for the proposition that "an entity [is] not immune where only the 'central government functions' factor weigh[s] in the entity's favor."). Nor would it be relevant to the first *Mitchell* factor if such an entity's contract specified that the state would indemnify it for its losses. As the Supreme Court held in *Regents of the University of California v. Doe*, 519 U.S. 425, 431 (1997), "it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant."

---

[10]*DMJM* also made clear that the federal government contractor defense, as stated by *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), is not of relevance here. "Neither the Supreme Court nor the Ninth Circuit nor any other court of which we are aware has applied the defense to state contractors." *DMJM*, 355 F.3d at 1147. In any event, "the government contractor defense does not confer sovereign immunity on contractors." *Id.* (citing *Boyle*, 487 U.S. at 505 n. 1).

**[6]** It is, in other words, a category error[11], and therefore a waste of both judicial resources and litigants' time, to apply the *Mitchell* factors to private entities.[12] By their nature, such entities are not arms of the state. *See also Durning*, 950 F.2d at 1427 (denying immunity to a state-created public development corporation and noting that the corporation was "more closely tied to the state than an ordinary corporation").

ACCS nonetheless attempts to distinguish *DMJM* by arguing that it is performing a central governmental function according to contract rather than committing fraud in the course of performing on its contract, as was the case in *DMJM*. But, as we have just explained, ACCS's performance on its contract is irrelevant to the sovereign immunity inquiry.[13] That question instead turns on ACCS's nature as a private entity rather than on some quirk of its contract, its behavior, or the allegations brought against it. ACCS's argument cannot succeed.

---

[11]A category error, or "type-trespass," occurs when we place an entity in the wrong class or category of things, resulting in a fundamental failure of analysis. Examples of category errors include inquiring into the gender of a rock or into which day of the week is reptilian. *See* GILBERT RYLE, *Categories*, *in* COLLECTED PAPERS, VOLUME II: COLLECTED ESSAYS 1929-1968, 170-84 (1970).

[12]Not surprisingly, ACCS would not fare any better if we did apply *Mitchell*. It is questionable, first, that its activities — which appear to be primarily administrative and relating to debt collection rather than to law enforcement — constitute a central government function. *See, e.g.*, *Gradisher v. Check Enforcement Unit, Inc.*, 133 F. Supp.2d 988, 990 (W.D. Mich. 2001) (characterizing a company operating a similar bad check diversion program as a debt collector). But even assuming the contrary, ACCS is manifestly a private corporation, capable of suing and being sued and holding property in its own name. And there is no question of the state somehow being legally responsible for its liabilities: ACCS is an independent contractor, is required to carry its own insurance, and must indemnify the county for any liabilities that it might incur.

[13]Moreover, ACCS's attempt to distinguish *DMJM* assumes a favorable outcome to it on the merits. The consolidated complaint alleges that ACCS made "numerous false representations" and the CUBPA claim alleges that ACCS committed "fraudulent acts or practices."

### c.   Cases from Other Circuits

Our conclusion is in accord with that reached by our sister circuits. All but the Eleventh Circuit have denied state sovereign immunity to private entities, more or less categorically. Many of the cases concerned entities that were somewhat more governmental in nature than a purely private contractor like ACCS, and so lend no support to granting immunity to such an entity. And even the Eleventh Circuit recently held that ACCS itself is not entitled to state sovereign immunity.

The Seventh Circuit well explained the difficulties inherent in extending the doctrine to private parties in *Takle v. University of Wisconsin Hospital and Clinics Authority*, 402 F.3d 768 (7th Cir. 2005), a case concerning a recently privatized state hospital originally created by statute. The hospital still had many ties to the state, which owned its buildings and provided funds for its medical school, among other things. *Id.* at 770-71. Even such public/private "hybrid entities," held *Takle*, were not entitled to sovereign immunity. Connections to the state even as substantial as those of the University of Wisconsin Hospital's did "not require that privatization be treated as a farce in which the privatized entity enjoys the benefits both of not being the state and so being freed from the regulations that constrain state agencies, and of being the state and so being immune from suit in federal court." *Id.*

Other circuits have denied sovereign immunity to similarly "hybrid" entities. In *Fresenius*, the First Circuit held that a statutorily-created public corporation, with a board partially-appointed by the governor of Puerto Rico and some state funding, was sufficiently separate from the Commonwealth as to lack immunity.[14] 322 F.3d at 75; *see also Pastrana-Torres v. Corporación de Puerto Rico Para La Difusión Pública*, 460

---

[14] The First Circuit has held that "the Commonwealth of Puerto Rico is treated as a state for Eleventh Amendment purposes." *Fresenius*, 322 F.3d at 61.

F.3d 124, 126-28 (1st Cir. 2006) (relying on *Fresenius* to deny immunity to a Puerto Rican public broadcasting company created by state statute but having its own legal identity). Similarly, the Tenth Circuit, in *United States ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 721 (10th Cir. 2006), declined to extend state sovereign immunity to a laboratory wholly owned by the University of Utah system, as its "day-to-day operations" were independent from the University, its liabilities isolated from the state, and its business that of "a commercial laboratory." *Id.* at 718-20. As the Tenth Circuit held, "common sense and the rationale of the Eleventh Amendment do not require that sovereign immunity attach when an agency is structured to be self-sustaining and has a long history of its own way." *Id.* at 721.

Parties closer to the private end of the spectrum have, not surprisingly, fared as poorly in their efforts to acquire state sovereign immunity. In *Brotherton v. Cleveland*, 173 F.3d 552, 561 (6th Cir. 1999), "a nonprofit, private corporation" authorized by Ohio statute to collect donated corneas was not accorded immunity, as its only connection to the state was the authorizing statute. And in *United States ex rel. Barron v. Deloitte & Touche, L.L.P.*, 381 F.3d 438, 441 (5th Cir. 2004), the Fifth Circuit denied sovereign immunity to a Medicaid provider which it characterized as a "purely private corporation." It observed, as we do today, that the factors normally used to assess whether an entity is an arm of the state are "difficult to evaluate in the context of a private corporation" because "[m]ost 'arm of the state' cases address the distinction between local and state control," rather than the operation of a purely private entity. *Id.*

Only the Eleventh Circuit has ever, as far as we can ascertain, accorded sovereign immunity to a private entity, under an analysis which we do not find persuasive and which, in any event, the Eleventh Circuit has made clear does not accord immunity to ACCS. *Shands Teaching Hospital and Clinics, Inc. v. Beech Street Corporation*, 208 F.3d 1308, 1311 (11th

Cir. 2000), provided a private administrator of a state health care plan with sovereign immunity, reasoning that "[t]he pertinent inquiry is not into the nature of a corporation's status in the abstract, but its function or role in a particular context," and that the health care plan was essentially controlled by the state. *Id.* Relying upon cases which it characterized as extending federal sovereign immunity to Medicare providers, *Shands* extended immunity. *Id.*

*Shands* was, in our view, doubly in error. First, albeit in the qualified immunity context, the Supreme Court has warned that "a purely functional approach [to the private entity immunity inquiry, as used in *Shands*,] bristles with difficulty," because "government and private industry may engage in fundamentally similar activities," even though private entities are not entitled to immunity. *Richardson v. McKnight*, 521 U.S. 399, 409 (1997). Second, and more importantly, the Medicare cases upon which *Shands* relied did *not* accord sovereign immunity to private parties. Instead, Medicare regulations provide that private intermediaries "act on behalf" of the government, and that the government is "the real party in interest" in any litigation involving the program. *See* 42 C.F.R. § 421.5(b).[15] Their contracts therefore treat suits against them as against the sovereign governmental entity itself, rather than extending sovereignty to private parties. We have recognized as much. *See Kaiser v. Blue Cross of Calif.*, 347 F.3d 1107, 1117 (9th Cir. 2003) (discussing "real party in interest" regulations and citing *Shands* as part of the Medicare line of cases). There is no such regulatory or statutory provision here.

---

[15]All of the cases cited by *Shands* recognize the importance of these regulations. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2nd Cir. 1998) (citing provision); *Anderson v. Occidental Life Ins. Co.*, 727 F.2d 855, 856 (9th Cir. 1984) (per curiam) (referencing provision); *Pine View Gardens, Inc. v. Mut. of Omaha Ins. Co.* 485 F.2d 1073, 1074-75 (D.C. Cir. 1973) (referencing provision); *Matranga v. Travelers Ins. Co.*, 563 F.2d 677, 677 (5th Cir. 1977) (citing earlier version of provision); *Peterson v. Weinberger*, 508 F.2d 45, 51 & n. 7 (5th Cir. 1975) (quoting earlier version of provision).

Moreover, the Eleventh Circuit recently recognized that *Shands* does not support ACCS's claim to sovereign immunity for its contractual diversion program activities. In *Rosario v. American Corrective Counseling Services, Inc.*, 506 F.3d 1039, 1047 (11th Cir. 2007), which is on all fours with this appeal in all relevant regards, the Eleventh Circuit held that even the functional analysis supplied by *Shands* did not support ACCS's claimed immunity, holding that "[t]he standard for Eleventh Amendment immunity has never been held to apply simply because an independent contractor performs some government function . . . . ACCS is not entitled to Eleventh Amendment immunity." *Id.*

There is, then, no case of which we are aware in any circuit that would support granting state sovereign immunity to ACCS.

## III.

[7] The law makes clear that state sovereign immunity does not extend to private entities.[16] The district court was therefore right to let this suit proceed.

**AFFIRMED.**

---

[16]To be clear: Although we hold that private entities cannot be arms of the state, we emphatically do *not* hold that they cannot act under color of state law for the purposes of 42 U.S.C. § 1983 and similar statutes. The two concepts are distinct. *Compare Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (counties and similar municipal corporations are not arms of the state for sovereign immunity purposes) *with Monell v. Dep't. of Social Serv. of the City of N.Y.*, 436 U.S. 658, 694 (1978) (local governments may be sued under § 1983 in some circumstances).