Filed 01/12/26

VERMONT SUPERIOR COURT
Windham Unit
7 Court Street
Newfane VT 05345
802-365-7979
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 25-CV-01839

---

**Dawn Benware, et al v. VitalCore Health Strategies, LLC, et al.**

---

### Ruling on Motions (#15, #16, #17) to Dismiss Claims Against VitalCore and Drs. Leppman and Fisher

Decedent Alexander Kelley died from undiagnosed and untreated bacterial (infective) endocarditis, determined following an autopsy, while a pretrial detainee in the custody of the Vermont Department of Corrections (DOC).[1] Plaintiff Ms. Dawn Benware is Mr. Kelley's mother and the administrator of his estate. She brought this action against many defendants asserting wrongful death and survival claims. Defendant VitalCore Health Strategies, LLC, was—by contract with the DOC—responsible for providing all medical care to inmates at the Southern State Correctional Facility (SSCF) at which Mr. Kelley was located during the underlying events, and he was treated by (among many others) both Defendants Dr. Steven Fisher and Dr. John Leppman. Dr. Fisher is not expressly alleged to have been a VitalCore employee; Dr. Leppman is.[2]

As against Drs. Fisher and Leppman, Ms. Benware claims (in the second amended complaint): deliberate indifference to a serious medical need under both the 8th Amendment pursuant to 42 U.S.C. § 1983 and Article 18 of the Vermont Constitution (count 1); common law gross negligence (count 6); and medical negligence (count 7). Those claims are asserted, after a fashion, against VitalCore as well. Ms. Benware also claims against VitalCore: failure to train medical staff as a violation of substantive due

---

[1] For basic context only: the endocardium is the "innermost tunic [layer] of the heart, which includes endothelium and subendothelial connective tissue; in the atrial wall, smooth muscle and numerous elastic fibers also occur." Stedmans Medical Dictionary 290630. Endocarditis is "[i]nflammation of the endocardium." Stedmans Medical Dictionary 290370. Bacterial endocarditis is "endocarditis caused by the direct invasion of bacteria and leading to deformity and destruction of the valve leaflets." Stedmans Medical Dictionary 290410. Intravenous drug users "are one of the leading groups at high risk for developing [bacterial endocarditis]. Between 5% and 8% of hospital admissions in [intravenous drug users] are due to endocarditis. Because [intravenous] cocaine users inject themselves so frequently relative to other [intravenous drug user] groups, they appear to have the highest risk of developing [bacterial endocarditis]." Harwood Nuss' Clinical Pract. of Emergency Medicine, 6th ed. ch. 88 (citations omitted).

[2] Despite the lack of an express allegation, the implication from the record and Dr. Fisher's representation by VitalCore's counsel is that he was employed by VitalCore. The issue is immaterial to this decision.

1

process rights pursuant to 42 U.S.C. § 1983 and the Vermont Constitution (count 2); failure to supervise nursing staff in violation of substantive due process rights pursuant to 42 U.S.C. § 1983 and the Vermont Constitution (count 3); failure to supervise medical staff (common law tort) (count 4); and failure to train nursing staff (common law tort) (count 5).[3]

Drs. Fisher and Leppman have filed Rule 12(b)(6) motions to dismiss all claims against them, largely arguing that the allegations are too conclusory and insufficient to state a claim.[4] They also argue that they are entitled to sovereign immunity to the extent that they have been sued in their official capacity. VitalCore also has filed a Rule 12(b)(6) motion to dismiss for failure to state a claim. It argues as to counts 1, 2, and 3 that the complaint fails to sufficiently allege any VitalCore policy or practice resulting in injury to Mr. Kelley; and as to counts 4, 5, and 6 that the allegations are too conclusory. VitalCore also argues that it is protected by the State's sovereign immunity. It further asks the court to strike from the complaint certain allegations that it considers immaterial and scandalous. Finally, VitalCore preemptively argues that Ms. Benware should not be permitted to amend the complaint a third time.

1. *Procedural Standard*

A motion to dismiss for failure to state a claim faces a high bar. The Vermont Supreme Court has described the familiar standard for Rule 12(b)(6) motions to dismiss for failure to state a claim as follows:

> "A motion to dismiss . . . is not favored and rarely granted." This is especially true "when the asserted theory of liability is novel or extreme," as such cases "should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations." In reviewing a motion to dismiss, we consider whether, taking all of the nonmoving party's factual allegations as true, "'it appears beyond doubt' that there exist no facts or circumstances that would entitle the plaintiff to relief." We treat all reasonable inferences from the complaint as true, and we assume that the movant's contravening assertions are false.

*Alger v. Dep't of Labor & Indus.*, 2006 VT 115, ¶ 12 (citations omitted); see also 5B A. Benjamin Spencer, et al., Fed. Prac. & Proc. Civ. § 1357 (4th ed.) ("Ultimately, the burden is on the moving party to prove that no legally cognizable claim for relief

---

[3] Although the issue has not been presented by the parties, and thus the court does not address it, see generally *Murray v. City of Barre*, 2025 WL 3619982 (Vt. Super. Ct. Dec. 08, 2025) (considering whether direct claim of negligent supervision against employer is viable where employer's indirect liability (respondeat superior) would apply).

[4] The motions (#15, #16, #17) under consideration here effectively supersede the same parties' motions (#7, #8, #9), which were filed prior to the second amendment of the complaint. To avoid any potential confusion in the record, the court notes that the earlier motions are moot and will not otherwise be addressed.

exists.”). In other words, dismissal is proper only when it is beyond doubt that there exist no facts or circumstances, consistent with the complaint that would entitle the plaintiff to relief. *Union Mut. Fire Ins. Co. v. Joerg,* 2003 VT 27, ¶ 4. The Vermont Supreme Court has made clear that “[t]he complaint is a bare bones statement that merely provides the defendant with notice of the claims against it.” *Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 13 . “[T]he threshold a plaintiff must cross in order to meet our notice-pleading standard is ‘exceedingly low.’” *Bock v. Gold*, 2008 VT 81, ¶ 4. The purpose of the complaint “is to initiate the cause of action, not prove the merits of the plaintiff’s case.” *Colby*, 2008 Vt. 20, ¶ 13. The mere absence of an allegation or an element is not a proper basis for dismissal. *Id.*; see also 5A Wright & Miller, Federal Practice and Procedure: Civil 2d § 1356, at 296 (“The Rule 12(b)(6) motion . . . is not designed to correct inartistic pleadings.”).

2. *The narrative in the complaint*

The allegations of the complaint (with which Defendants repeatedly note their strong disagreement) may be summarized briefly as follows. Mr. Kelley was arrested and taken to SSCF, where a medical intake was performed on March 1, 2023. He reported being an illicit drug user, tested positive for cocaine and opiates, and was identified as “currently detoxing/risk for detox.” The next day, an opiate withdrawal order (COWS order) was issued. The COWS order, among other things, prescribed certain medications, required a follow-up reassessment within 7 days, ordered observation, and identified numerous conditions that would warrant contacting the health care provider. It also said: “CONTACT HCP AT ANY TIME IF PATIENT BECOMES UNSTABLE.”

In the ensuing days, nursing staff observed Mr. Kelley’s health deteriorate precipitously in a manner that would alarm any reasonable layperson. Sometimes nursing staff recorded his vitals, sometimes they did not. Sometimes when his condition deviated from the COWS order (which was very frequently), nursing staff consulted with Dr. Fisher, sometimes they did not. Despite being consulted many times, Dr. Fisher did very little other than ordering an electrocardiogram and flu, Covid, and urinalysis tests, he did nothing whatsoever that might have led to a bacterial endocarditis diagnosis or that intervened in any material way with Mr. Kelley’s decline. Often, in response to reports of manifestly distressing symptoms, he simply did nothing at all. Dr. Fisher never personally examined Mr. Kelley in spite of all the reports of serious and concerning symptoms and the medical records that, even though not as complete as they should have been, should have indicated to him that something likely catastrophic was happening to Mr. Kelley.

On March 10, as Mr. Kelley was nearing death, Dr. Leppman performed the follow-up assessment that was supposed to have been conducted no later than March 8. He apparently observed nothing of particular interest, believed that Mr. Kelley had simply been sleeping too much, and should be moved to general population (from the booking unit) sooner rather than later. Dr. Leppman never followed up or provided any other care to Mr. Kelley despite medical records that should have indicated to him that something likely catastrophic was happening to Mr. Kelley.

Within a couple days, and with no further treatment from anyone, Mr. Kelley, for example, experienced severe aches and pain, was observed to be unable to get up or walk, experienced sweating and tremors, and was found lying on the floor unable to move, having urinated on himself. On March 13, a corrections officer – a layperson – observed Mr. Kelley's condition, and remarked that he looked like he would die without medical assistance. No one sought medical assistance of any kind or notified either Dr. Fisher or Leppman. By this point, Dr. Fisher, in particular, had received many reports of seriously concerning conditions to which he had largely done nothing.

At 11:30 p.m. on March 13, a corrections officer told VitalCore staff that "Kelley had labored breathing, was lethargic, and was not eating." Staff responded that they were aware and proceeded to do nothing. With no aid provided by anyone, Mr. Kelley was last observed breathing at about 12:55 a.m. on March 14. No one did anything. He was observed to be entirely unresponsive and not breathing at 1:09 a.m. on March 14. Only then did anyone attempt any lifesaving measures. But it was too late, and he was pronounced dead shortly thereafter.

After an autopsy, it was determined that Mr. Kelley died of bacterial endocarditis. See n.1 at 1. The manifest need for diagnostic imaging of his heart should have been obvious long before he died. Had it been done, he would have been diagnosed and treated appropriately.

The prolific failure of nursing staff to properly document their observations, follow the COWS order, seek assistance from the doctors, and respond to the developing emergency was due in part to VitalCore's lack of relevant policies, lack of effective training programs, and persistent practice of permitting such deficiencies.

*Analysis*

3. *VitalCore's request to strike*

The complaint includes certain allegations to the effect that at one point the DOC experienced more inmate deaths than usual and recommended that contractor receive additional training. VitalCore argues that those allegations or implications are misleading and highly prejudicial. It requests (this "motion" is embedded in its motion to dismiss) that the court strike the relevant allegations pursuant to V.R.C.P. 12(f) as "immaterial, impertinent, or scandalous matter."

The court declines to strike those paragraphs of the complaint. As a leading treatise explains:

> [F]ederal judges have made it clear, in numerous opinions they have
> rendered in many substantive contexts, that Rule 12(f) motions to strike
> on any of these grounds are not favored, often being considered purely
> cosmetic or "time wasters," there appears to be general judicial agreement,
> as reflected in the extensive case law on the subject, that they should be
> denied unless the challenged allegations have no possible relation or

4

logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action. Any doubt about whether the challenged material is redundant, immaterial, impertinent, or scandalous should be resolved in favor of the non-moving party.

5C Wright & Miller, Fed. Prac. & Proc. Civ. § 1382 (3d ed.); see also *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("[T]he courts should not tamper with the pleadings unless there is a strong reason for so doing."). Other than VitalCore's professed offense at the implications of the allegations, no prejudice is apparent. Moreover, four of the claims in this case deal with alleged failures by VitalCore to properly train and supervise medical staff. If there were some perceived need by the DOC for more training of medical staff, any such evidence could be relevant.

### 4. *Sufficiency of the allegations*

Many of Defendants' dismissal arguments are variations on the theme that the factual allegations are so vague, conclusory, or incomplete as to amount to a failure to state a claim. The court declines to parse the details of these arguments because they plainly are at war with the applicable procedural standard. The court is satisfied that Defendants have basic notice of the claims being asserted against them, which is all they are entitled to under V.R.C.P. 8(a)(1). If they truly believe that the claims are asserted against them so defectively that they cannot reasonably be expected to understand what the claims are or how to respond to them—which is highly unlikely—they could have filed a motion for more definite statement. V.R.C.P. 12(e). They have not. Otherwise, the claims will be more profitably explored in discovery and future motion practice once the evidence develops.

### 5. *Further amendment of the complaint*

In that regard, the court declines VitalCore's extraordinary request for a proactive ruling to the effect that the complaint can never again be amended, apparently under any circumstances. There is no evident need for amendment, and Ms. Benware is not currently seeking leave to amend.

### 6. *Exhibit A to Dr. Leppman's motion to dismiss*

The court also notes that Dr. Leppman's submission of new evidence (Exhibit A) in support of his motion to dismiss (though moot) is not helpful in any event. The record for Rule 12(b)(6) purposes generally is limited to the four corners of the complaint and any attachments to it. See *Nash v. Coxon*, 152 Vt. 313, 314–15 (1989) ("[I]f matters outside the pleadings are presented and not excluded by the court, the motion to dismiss must be treated as one for summary judgment." (internal quotation and citation omitted)). There is a limited exception: documents sufficiently referred to and relied upon in the complaint may properly be considered in a motion to dismiss even if not attached to the complaint. See *Kaplan v. Morgan Stanley & Co.*, 2009 VT 78, ¶ 10 n.4.

The new evidence is a medical record documenting Dr. Leppman's evaluation of Mr. Kelley. Dr. Leppman argues that the complaint refers to the evaluation in a misleading manner, and he simply wants to introduce this evidence to clarify what actually happened. The court doubts that the complaint sufficiently relies on this record for it to be properly considered incorporated into it for Rule 12(b)(6) purposes. However, the court disregards it for a different reason. Despite his effort to cabin the claims against him by his one brief evaluation of Mr. Kelley, the claims are fairly construed to be more broadly based on the records that Dr. Leppman presumably should have reviewed, and the lack of any follow-up thereafter. Thus, the while the record of the in-person visit may add some context, the dismissal record would continue to lack other important context (notably, Mr. Kelley's complete medical records and anything else Dr. Leppman knew or should have known). In light of the larger context of the claims, permitting the introduction of this one medical record would be unfair.

7. *Sovereign immunity as to Drs. Fisher and Leppman*

Drs. Fisher and Leppman argue that, to the extent that the claims are asserted against them in their official capacity, they are entitled to sovereign immunity. There is no need to address sovereign immunity. The court simply notes that it discerns no official capacity claims against them in the complaint, and Ms. Benware expressly and repeatedly has said that there are no such claims. The court declines to dismiss claims that have not been made.

8. *Sovereign immunity as to VitalCore*

VitalCore also argues that sovereign immunity protects it from Ms. Benware's claims. The court understands VitalCore's argument to proceed as follows: (1) medical decisions made by government employees are automatically subject to the discretionary function exception to the waiver of sovereign immunity under the Vermont Tort Claims Act, 12 V.S.A. § 5601–5606; (2) private persons can be subject to liability under 42 U.S.C. § 1983; and (3) therefore, sovereign immunity extends to such private persons. See 12 V.S.A. § 5601(e)(1) (discretionary function exception). The second premise is accurate. Otherwise, this argument starts off on the wrong foot and reaches a baseless conclusion.

A § 1983 claim may be brought against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia" deprived the plaintiff of a federal right. 42 U.S.C. § 1983. Section 1983 defendants can be private persons who are not government employees. See 1 Section 1983 Litigation in State and Federal Courts § 2:9 ("Private defendants . . . sometimes act under 'color of state law' in ways that implicate federal constitutional provisions, and the U.S. Supreme Court has developed five overlapping tests to determine when the actions of otherwise private defendants can be the basis for § 1983 actions.").

VitalCore's contention that *any* medical decision-making by a governmental employee is subject to the discretionary function exception, however, is patently wrong. VitalCore cites one 60+ year old case for that proposition: *Blitz v. Boog*, 328 F.2d 596 (2d Cir. 1964). In that case the court concluded that medical decision-making has an element of

discretion, and it at least appears to have concluded for that reason that it is subject to the discretionary function exception. *Id.* at 599–600. *Blitz*, however, long predates *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991) (citations omitted), which clarified once and for all that "even 'assuming the challenged conduct involves an element of judgment,' it remains to be decided 'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" See also *Searles v. Agency of Transp.*, 171 Vt. 562, 563 n.* (2000) (adopting *Gaubert* for purposes of Vermont law). The *Blitz* court determined that discretion was involved and never performed the second, critical part of the test. Contemporary courts more attentive to the second part of the test—whether the discretion exercised involved government policy matters—have come to a starkly contrary and palpably correct conclusion. See, e.g., *Sigman v. U.S.*, 217 F.3d 785, 795 (9th Cir. 2000) (citing cases and then concluding, "These cases are all examples of the now well-established principle that the discretionary function exception is intended to shield the government from liability for the exercise of governmental discretion, not to shield the government from claims of garden-variety medical malpractice."). The first premise to VitalCore's argument is baseless.

Nor has VitalCore come forward with any authority to the effect that the State's sovereign immunity might shield a private person from liability (either in the context of a § 1983 claim or otherwise). The great weight of authority is firmly to the contrary. See, e.g., *Del Campo v. Kennedy*, 517 F.3d 1070, 1075–81 (9th Cir. 2008) (examining the matter in detail and concluding, at 1080–81, "The law makes clear that state sovereign immunity does not extend to private entities."); 1 Civ. Actions Against State & Loc. Gov't § 1:12 ("[I]n determining whether sovereign immunity will preclude a particular action against the state, certain factors must be considered. An important consideration is whether the action is in fact one against the state. The state must be the real party in interest."); 13 Wright & Miller, Fed. Prac. & Proc. Juris. § 3524.2 (3d ed.) (What Constitutes the State for Eleventh Amendment Purposes); Justin C. Carlin, State Sovereign Immunity and Privatization: Can Eleventh Amendment Immunity Extend to Private Entities?, 5 Fla. Inter. Univ. L. Rev. 209, 229 (2009) ("State sovereign immunity does not extend to private entities—even when these entities perform work on behalf of the state."). VitalCore does not seriously contend that it is an "arm of the state" properly protected by sovereign immunity. The court declines to recognize that any such immunity applies to it.

9. *The negligent undertaking claims*

Page 1 of the complaint includes this: "This is a personal injury and wrongful death action pursuant to the Vermont Constitution, 42 U.S.C. § 1983, and 14 V.S.A. § 1492 for deliberate indifference, negligence, and negligent undertaking." Defendants ask the court to dismiss the negligent undertaking claims. They note that they mentioned the mysterious claim (that does not reappear in the itemization of the counts) in their motions to dismiss, Ms. Benware was silent in opposition, and now, to clarify the record, they request that the court dismiss those claims.

The court described above the claims that are clearly pleaded in the complaint. Apart from them, the court perceives no "negligent undertaking" claim in the complaint. While the complaint uses that expression once, the court construes the pleadings so "as to do substantial justice." V.R.C.P. 8(f); see also *Hayes v. Harwood*, 141 Vt. 308, 309 (1982) ("[I]t is the substance of the operative instrument that determines its judicial effect, not its label."). The court again declines to dismiss claims that do not exist.

**Order**

For the foregoing reasons, Defendants' motions (#15, #16, #17) to dismiss are DENIED. Defendants' motions (#7, #8, #9) to dismiss are moot.

Electronically signed: 1/9/2026 5:26:19 PM pursuant to V.R.E.F. 9(d)

John R. Treadwell
Superior Court Judge