FILED
United States Court of Appeals
Tenth Circuit

**November 9, 2022**

**Christopher M. Wolpert
Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TAMATHA HENNESSEY,

     Plaintiff - Appellant,

v.

UNIVERSITY OF KANSAS HOSPITAL
AUTHORITY,

     Defendant - Appellee.

No. 22-3000

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:21-CV-02231-EFM-TJJ)**
_____

Mary Beth Beasley and April Fortner, University of Colorado Law School Appellate
Advocacy Practicum (Matthew Cushing on the briefs), Boulder, Colorado, for Plaintiff –
Appellant.

J. Wesley Smith, Simpson, Logback, Lynch, Norris, P.A. (Trevin E. Wray with him on
the brief), Overland Park, Kansas, for Defendant – Appellee.
_____

Before **BACHARACH**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

Tamatha Hennessey alleges a radiology technician sexually assaulted her during her visit to the University of Kansas hospital for emergency medical care. Proceeding pro se, Ms. Hennessey brought a civil action for negligent supervision against the University of Kansas Hospital Authority ("UKHA"), which oversees operation of the hospital. UKHA moved to dismiss the action, arguing Ms. Hennessey failed to plead facts supporting subject matter/diversity jurisdiction and that it is entitled to sovereign immunity. UKHA premised both arguments on it being an arm of the state of Kansas and therefore entitled to the same immunities as the state. But UKHA failed to support its motion with any evidence demonstrating it is an arm of the state or any analysis of the factors governing whether a state-created entity is an arm of the state. The district court, relying on the statutory scheme creating UKHA, Kan. Stat. Ann. §§ 76-3301–3323 (the "University of Kansas Hospital Authority Act" or the "Act"), took it upon itself to analyze whether UKHA is an arm of the state. Finding the Act characterizes UKHA as an entity of the state, UKHA is not autonomous from the state, and UKHA is concerned with state-wide rather than local functions, the district court concluded UKHA is an arm of the state and, therefore, dismissed Ms. Hennessey's action.

Ms. Hennessey appeals, raising three arguments: (1) a procedural argument that the burden is on UKHA to demonstrate it is an arm of the state and it failed to meet this burden by not presenting any evidence and not arguing the factors governing the arm-of-the-state analysis; (2) a substantive argument that, regardless of the burden, the University of Kansas Hospital Authority Act supports the conclusion that UKHA is not

2

an arm of the state; and (3) a fallback argument that a remand for limited discovery and presentation of evidence is appropriate.

We now join every other circuit to consider the issue and hold the burden falls on the entity asserting it is an arm of the state. UKHA did not meet its burden. Furthermore, while our precedent permits a district court to raise the arm-of-the-state issue sua sponte, the district court erred in concluding that UKHA is not autonomous under the language of the University of Kansas Hospital Authority Act. Accordingly, we vacate the district court's order granting UKHA's motion to dismiss and remand for further proceedings.

## I.    BACKGROUND

### A.    *Factual Allegations*

Ms. Hennessey alleges the following facts in her pro se complaint.[1] *See Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006) ("[A]ll well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party." (quotation marks and ellipsis omitted)).

After suffering from right shoulder and left jaw pain for a few weeks, Ms. Hennessey sought treatment at the University of Kansas Hospital Emergency Room. A nurse ordered an MRI and CT scan. Jonathan McIntire, a radiology technician, was assigned to perform the tests. Mr. McIntire took Ms. Hennessey to a

---

[1] Although Ms. Hennessey is represented by counsel on appeal, she proceeded pro se in the district court. Thus, we liberally construe her complaint and response to UKHA's motion to dismiss, and hold these pleadings "to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

radiology room in a new part of the hospital far removed from the ER. Once there, Mr. McIntire instructed Ms. Hennessey to change into a different hospital gown and then strapped Ms. Hennessey's arms and legs to the MRI board. Mr. McIntire commenced the MRI.

During the MRI, Ms. Hennessey fell asleep, possibly from Ativan medication administered by ER staff. Ms. Hennessey awoke to Mr. McIntire "pinching her nipples." ROA at 12. Mr. McIntire then "groped one breast" and "put his mouth over [Ms. Hennessey's] breasts." *Id.* at 13.

It was not until four hours after the nurse ordered the MRI and CT scan that Mr. McIntire completed the tests and returned Ms. Hennessey to the ER. Ms. Hennessey contends a radiology technician could complete the tests in an hour and alleges hospital personnel were unaware she was out of the ER for a longer period than necessary to complete the tests.

## B.    *Procedural History*

Ms. Hennessey, through counsel, initially filed a civil suit in a Wyandotte County, Kansas district court, naming UKHA and Mr. McIntire as defendants. UKHA moved for judgment on the pleadings, raising various immunity and failure-to-state-a-claim defenses. Before the state district court ruled on the motion, Ms. Hennessey and UKHA stipulated to the voluntary dismissal of the action without prejudice.

Proceeding pro se, Ms. Hennessey turned to federal court, filing the action underlying this appeal in the United States District Court for the District of Kansas.[2] In describing the parties, Ms. Hennessey alleged she was "a resident of the State of Missouri residing [in] Belton, MO." *Id.* at 6. And Ms. Hennessey alleged UKHA "is and was a corporate entity established by law that operates the hospital located at 4000 Cambridge Street, Kansas City, Kansas 66106." *Id.* In a section labeled "Jurisdiction and Venue," Ms. Hennessey pleaded that "[j]urisdiction is proper because Defendant is a Kansas corporation and/or entity operating a hospital located in Kansas City, Wyandotte County, Kansas." *Id.* at 7. Ms. Hennessey's filing raised a single claim against UKHA for negligent supervision.

Supported by a three-page memorandum of law, UKHA moved to dismiss for lack of subject matter jurisdiction and based on sovereign immunity. In pertinent part, the memorandum of law read:

> While the Petition generally states that Plaintiff is a citizen of Missouri, she does not explicitly assert diversity jurisdiction. If she did assert diversity jurisdiction, however, sovereign immunity would similarly prevent the Court from allowing the case to proceed. The University of Kansas Hospital Authority is an instrumentality of the State of Kansas, and Eleventh Amendment immunity would prohibit a federal exercise of personal jurisdiction as to this Defendant. *See* K.S.A. 76-3304(a); *Perkins v. Univ. of Kan. Med. Ctr.*, 2014 U.S. Dist. LEXIS 47491, *9-10 (D. Kan. Apr. 7, 2014), citing *Ellis v. University of Kansas Medical Center*, 163 F.3d 1186, 1196 (10th Cir. 1998).

---

[2] Although Ms. Hennessey filed her action in the District of Kansas, the caption of her filing identified the court as "In The District Court of Wyandotte County Kansas." ROA at 6. Ms. Hennessey subsequently moved to amend or correct the caption to identify the District of Kansas as the court in which she filed the action, and the district court granted the motion.

*Id.* at 26–27. UKHA neither submitted any evidence in support of its motion nor identified or analyzed the factors governing whether an entity is an arm of the state. Ms. Hennessey responded to UKHA's motion to dismiss by arguing she (1) pleaded the elements of diversity jurisdiction by identifying the state of residence of each party and (2) could overcome sovereign immunity because UKHA was a corporate entity and a political subdivision of the state. Ms. Hennessey, however, did not request any discovery on the arm-of-the-state issue underlying UKHA's subject matter jurisdiction and sovereign immunity defenses.

UKHA filed a reply. On the issue of subject matter jurisdiction, UKHA contended it was an instrumentality and arm of the state such that it was therefore not a citizen of any state for purposes of diversity jurisdiction. But, once again, UKHA provided no factual support and no real analysis on this point, stating only:

> Plaintiff argues she invoked the jurisdiction of the United States District Court based upon diversity of citizenship as provided for in 28 U.S.C. § 1332. "To sustain diversity jurisdiction there must exist an 'actual', 'substantial', controversy between citizens of different states from all parties on the other side." *City of Indianapolis v. Chase Nat'l Bank of City of N.Y.*, 314 U.S. 63, 69 (1941). First and foremost, a state is not a citizen for purposes of diversity jurisdiction. *Moor v. Cty. of Alameda*, 411 U.S. 693, 717, 93 S. Ct. 1785, 1800 (1973). Defendant University of Kansas Hospital Authority is an instrumentality of the State of Kansas; therefore, it is not a citizen of the State for diversity purposes. *See Wilkins v. Kan. Dep't of Labor*, No. 6:12-CV-01363-JAR-KMH, 2013 U.S. Dist. LEXIS 19912, at *5 (D. Kan. Feb. 14, 2013); *Perkins v. Univ. of Kan. Med. Ctr.*, No. 13-2530-JTM, 2014 U.S. Dist. LEXIS 47491, at *6 (D. Kan. Apr. 7, 2014). Therefore, this Court lacks diversity jurisdiction over Plaintiff's claims.

*Id.* at 89. As to sovereign immunity, UKHA argued (1) entities created by and serving as alter egos of the state are entitled to sovereign immunity; and (2) it had not waived its right to sovereign immunity. UKHA supported the former argument with the following passage:

> The University of Kansas Hospital Authority . . . was created by the University of Kansas Hospital Act . . . in 1998. K.S.A. 76-3304(a). The act established the Authority as "a body politic and corporate, with corporate succession" whose exercise of rights, powers, and privileges are "deemed and held to be the performance of an essential government function." *Id.* A nineteen-member board of directors, thirteen of which are appointed by the governor and subject to confirmation by the senate, governs the Authority. K.S.A. 77-3304(b). Additionally, the Act grants the Authority the "duties, privileges, immunities, rights, liabilities, and disabilities of a body corporate and a political instrumentality of the state." K.S.A 77-3308(a)(1). Therefore, the immunity to suit in federal court granted to the State of Kansas by the Eleventh Amendment to the United States Constitution has been bestowed upon the Authority.

*Id.* at 90.

The district court undertook the heavy lifting that UKHA did not undertake in its motion to dismiss. The district court began by identifying the four factors from *Steadfast Ins. Co. v. Agriculture Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007), that govern the initial inquiry in the arm-of-the-state analysis—(1) state law characterization of the entity, (2) the entity's autonomy from the state, (3) the entity's finances and financial independence from the state, and (4) whether the entity addresses matters of local or state-wide concern. Although recognizing UKHA failed to present any evidence, the district court attempted to sua sponte analyze the four *Steadfast* factors by turning to the language of the University of Kansas Hospital

Authority Act. The district court concluded the Act characterized UKHA as an arm of the state, entitled to the "privileges" and "immunities" of a "body corporate and a political instrumentality of the state." *Id.* at 112 (quoting Kan. Stat. Ann. § 76-3308(a)(1)). The district court, for purposes of the fourth factor, also concluded UKHA served the goals of the citizens of Kansas such that it addressed matters of state-wide concern. The district court further found that the autonomy factor favored an arm-of-the-state conclusion, looking at (1) the appointment process for UKHA's Board of Directors; (2) the state's ownership of buildings in which UKHA operates; and (3) the requirement that UKHA obtain approval from the state before repairing or constructing any building. As for the finances factor, the district court indicated the factor was "difficult" to analyze in the absence of evidence but observed UKHA could not levy taxes and surmised that UKHA receives some state funding. *Id.* at 114. Concluding that at least three of the *Steadfast* factors favored an arm-of-the-state conclusion, the district court determined it could overlook the uncertainty on the finances factor and that UKHA was an arm of the state. From this determination, the district court concluded UKHA (1) was not a citizen of any state for purposes of diversity jurisdiction such that diversity of citizenship and subject matter jurisdiction were lacking, and (2) was entitled to sovereign immunity. Accordingly, the district court granted UKHA's motion to dismiss.

On appeal, Ms. Hennessey is now represented by the University of Colorado Law School Appellate Advocacy Practicum. In her opening brief, Ms. Hennessey

raises three arguments. First, Ms. Hennessey advances a procedural argument, contending the burden is on UKHA to prove it is an arm of the state and it could not have met its burden where it never identified, analyzed, or presented any evidence on the *Steadfast* factors. Second, Ms. Hennessey argues an analysis of the University of Kansas Hospital Authority Act under the *Steadfast* factors favors the conclusion that UKHA is not an arm of the state. Third, and in the alternative, Ms. Hennessey contends that if we are unsure whether UKHA is an arm of the state, we could remand for limited discovery on the *Steadfast* factors, particularly the factors regarding UKHA's autonomy from the state and its finances.

## II.    DISCUSSION

We start by providing the standard of review. Then we discuss sovereign immunity and the analytical framework and factors governing the arm-of-the-state analysis. Next, we consider the legal question of whether a plaintiff or the entity asserting it is an arm of the state has the burden of proof relative to the arm-of-the-state factors. Finally, after concluding this burden falls on the entity asserting it is an arm of the state, we assess whether UKHA met its burden.

### A.    *Standard of Review*

We review a district court's grant of a motion to dismiss de novo. *Albers v. Bd. of Cnty. Comm'rs*, 771 F.3d 697, 700 (10th Cir. 2014). Specific to a dismissal for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), we review the dismissal de novo but review any factual findings underlying

the dismissal for clear error. *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001). We also "review de novo the district court's dismissal based on sovereign immunity." *Mojsilovic v. Okla. ex rel. Bd. of Regents for Univ. of Okla.*, 841 F.3d 1129, 1131 (10th Cir. 2016).

B.     ***Sovereign Immunity and Legal Framework for Arm-of-the-State Analysis***

The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Derived from this language "is the privilege of the sovereign not to be sued without its consent." *Va. Office of Protection & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). But although the Eleventh Amendment imposes a jurisdictional limitation on a court's ability to hear a case against a state once raised by the state, *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000), it "does not automatically destroy original jurisdiction" because a "[s]tate can waive the defense," *Wisc. Dep't of Corrs. v. Schacht*, 524 U.S. 381, 389 (1998).

"In terms of scope, Eleventh Amendment immunity extends to states and state entities but not to counties, municipalities, or other local government entities." *Steadfast Ins. Co.*, 507 F.3d at 1253; *see also Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000) ("[T]he arm-of-the-state doctrine bestows immunity on entities created by state governments that operate as alter egos or instrumentalities of the states." (quotation marks omitted)). "If a state entity is more like a political

10

subdivision—such as a county or city—than it is like an instrumentality of the state, that entity is not entitled to Eleventh Amendment immunity." *Steadfast Ins. Co.*, 507 F.3d at 1253. "Although ultimately a matter of federal law, arm-of-the-state status must be determined in each case by reference to the particular state laws characterizing the entity." *Sturdevant*, 218 F.3d at 1164; *see also Duke v. Grady Mun. Schls.*, 127 F.3d 972, 975 (10th Cir. 1997) ("[T]hat federal question can be answered only after considering the provisions of state law that define the agency's character." (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997))).

In assessing whether an entity is an arm of the state, we employ a two-step process. *Duke*, 127 F.3d at 978; *see also Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994) ("When indicators of immunity point in different directions, the Eleventh Amendment's twin reasons for being remain our prime guide.").[3] As an initial, sometimes dispositive, step, we evaluate four "primary factors":

---

[3] *Hess v. Port Authority Trans-Hudson Corp.* involved an entity created by an interstate compact with Congressional approval rather than an entity created by a single state. 513 U.S. 30, 40–41 (1994). The Supreme Court, however, has cited *Hess*, without qualification, in subsequent cases featuring arm-of-the-state analyses involving entities created by a single state. *See Auer v. Robbins*, 519 U.S. 452, 456 n.1 (1997); *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 430 (1997). Thus, circuit courts have presumed principles set forth in *Hess* are applicable to the analysis of an intrastate entity created by a single state. *Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico & Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 64–68 (1st Cir. 2003); *see also Takle v. Univ. of Wis. Hosp. & Clinics Auth.*, 402 F.3d 768, 769–72 (7th Cir. 2005) (citing *Hess* while conducting analysis of entity created by a single state).

11

> *First*, we assess the character ascribed to the entity under state law. Simply stated, we conduct a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state. *Second*, we consider the autonomy accorded the entity under state law. This determination hinges upon the degree of control the state exercises over the entity. *Third*, we study the entity's finances. Here, we look to the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf. *Fourth*, we ask whether the entity in question is concerned primarily with local or state affairs. In answering this question, we examine the agency's function, composition, and purpose.

*Steadfast Ins. Co.*, 507 F.3d at 1253 (double emphasis added).

If these factors are in conflict and point in different directions, a court should proceed to the second step and consider the "twin reasons" underlying the Eleventh Amendment—avoiding an afront to the dignity of the state and the impact of a judgment on the state treasury. *Duke*, 127 F.3d at 978 (quoting *Hess*, 513 U.S. at 47); *see also Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico & Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 65 (1st Cir. 2003) ("If the structural indicators point in different directions, then the second stage of analysis comes into play."). Of these twin reasons, the "foremost" reason for sovereign immunity is avoiding state liability for any judgment against the entity. *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 718 (10th Cir. 2006), *abrogated on other grounds by Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 1507, 1511 n.* (2019); *see also Fresenius Med. Care Cardiovascular Res., Inc.*, 322 F.3d at 66 ("[T]he circuits almost uniformly find that, when there is an ambiguity about the direction in which the structural analysis points, the potential payment from

the state treasury is the most critical factor in determining whether an entity is operating as an arm of the state." (citing 17A J.W. Moore, Moore's Federal Practice § 123.23(4)(b), a 123–60 & n.51 (3d ed. 2000))); *Duke*, 127 F.3d at 974 ("The Supreme Court has indicated more recently that 'the vulnerability of the State's purse is the most salient factor in Eleventh Amendment determinations'" (brackets omitted) (quoting *Hess*, 513 U.S. at 48)).

The focus of this judgment liability issue is on direct legal liability and not on any indirect or practical loss of funds to the state. *Sikkenga*, 472 F.3d at 718; *see also Duke*, 127 F.3d at 981 ("We interpret *Doe* to require us to focus on legal liability for a judgment, rather than practical, or indirect, impact a judgment would have on a state's treasury." (citing *Doe*, 519 U.S. at 429–30)). While focusing on legal liability rather than practical effect may "ignore[] economic reality," it "provides a clear and workable test in this very confused area of the law. It directs courts away from having to make case-by-case fact-specific determinations of the practical impact on state treasuries." *Duke*, 127 F.3d at 981. "Where it is clear that the state treasury is not at risk, then the control exercised by the state over the entity does not entitle the entity to Eleventh Amendment immunity." *Fresenius Med. Care Cardiovascular Res., Inc.*, 322 F.3d at 65.

As to the dignity of the state, a court must remember that where "the state has not clearly demarcated the entity as sharing its sovereignty, there is great reason for caution" because "[i]t would be every bit as much an affront to the state's dignity and

fiscal interests were a federal court to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty." *Id.* at 63. To this point, "[n]ot all entities created by states are meant to share state sovereignty. Some entities may be part of an effort at privatization, representing an assessment by the state that the private sector may perform a function better than the state." *Id.* at 64. In fact, incorrectly designating an entity as an arm of the state may have negative consequences on the state's goal of creating an entity with better commercial and employee hiring bargaining power based on its independent structure. *Id.*

### C.    Burden on Entity Asserting Arm-of-the-State Status

Before analyzing whether UKHA is an arm of the state, it is necessary to determine whether Ms. Hennessey or UKHA bore the burden on this matter. This question is a matter of first impression for our circuit. *See Patterson v. Rural Water Dist. 2*, 438 F. Supp. 3d 1258, 1268 (W.D. Okla. 2020) ("Neither the Supreme Court nor the Tenth Circuit has decided who carries the burden of persuasion regarding Eleventh Amendment immunity."); *see also Ross v. Colo. Dep't of Transp.*, No. 11-cv-02603-REB-KMT, 2012 WL 5975086, at *5 (D. Colo. Nov. 14, 2012). Other circuits, however, unanimously agree that the burden falls on the entity asserting it is an arm of the state when the issue arises solely in the context of sovereign immunity.[4] *See Woods v. Rondout*

---

[4] District court decisions both within our circuit and in other circuits without precedent on the issue also advance the position that the burden falls on the entity

*Valley Central Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006) (collecting cases

from Third, Fifth, Sixth, Seventh, and Ninth Circuits and stating, "[w]e now join these

sister courts in holding that the governmental entity invoking the Eleventh Amendment

bears the burden of demonstrating that it qualifies as an arm of the state entitled to share

in its immunity"); *Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico &*

*Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 61 (1st Cir. 2003) ("[T]he entity

asserting Eleventh Amendment immunity[] bears the burden of showing it is an arm of

the state."). For four reasons, we adopt the position advanced by this persuasive

authority.

First, we have described sovereign immunity as a "defense" that a state or a state-

formed entity may assert. *Steadfast Ins. Co.*, 507 F.3d at 1252. Although some exceptions

exist, the defendant typically bears the burden when asserting a defense.

Second, in assigning the burden, we are cognizant of which party possesses the

evidence on the issue. As stated by the Ninth Circuit when assigning the burden to the

---

asserting arm-of-the-state status. *See Brady v. Office of the Cnty. Prosecutor*, No. 19-16348 (ES) (SCM), 2020 WL 5088634, at *2–3 (D. N.J. Aug. 28, 2020); *Robinson v. Paulhus*, No. 19-12572 (MAS) (TJB), 2020 WL 2732132, at *2 (D. N.J. May 22, 2020); *Patterson v. Rural Water Dist. 2*, 438 F. Supp. 3d 1258, 1268 (W.D. Okla. 2020);*Giddings v. Utah Transit Auth.*, 107 F. Supp. 3d 1205, 1208 (D. Utah 2015); *Ross v. Colo. Dep't of Transp.*, No. 11-cv-02603-REB-KMT, 2012 WL 5975086 at *5 (D. Colo. Nov. 14, 2012); *Thomas v. Guffy*, No. Civ-07-823-W, 2008 WL 2884368, at *1, *4 (W.D. Okla. July 25, 2008) (order adopting report and recommendation with report and recommendation attached to order); *Teichgreaeber v. Memorial Union Corp. of the Emporia State Univ.*, 946 F. Supp. 900, 903 (D. Kan. 1996); *see also Reynolds v. Flynn*, No. 21-cv-01154-RM-NYM, 2022 WL 252327, at *6 (D. Colo. Jan. 27, 2022) (placing burden on sheriff sued in official capacity to establish county was an arm of the state).

entity asserting arm-of-the-state status, it is a "familiar principle that, 'when the true facts relating to a disputed issue lie peculiarly within the knowledge of' one party, the burden of proof may properly be assigned to that party 'in the interest of fairness.'" *ITSI T.V. Prods., Inc. v. Agric. Assocs.*, 3 F.3d 1289, 1292 (9th Cir. 1993) (brackets omitted) (quoting *United States v. Hayes*, 369 F.2d 671, 676 (9th Cir. 1966)). Here, while the text of the University of Kansas Hospital Authority Act is readily available to a would-be plaintiff, UKHA is in possession of key evidence regarding its finances, day-to-day operations, and operating procedures. Accordingly, it makes sense to assign the burden to UKHA.[5]

Third, placing the burden on the party asserting sovereign immunity indirectly advances one of the primary purposes of sovereign immunity. "Sovereign immunity does not merely constitute a defense to monetary liability or even to all types of liability. Rather, it provides an immunity from suit." *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 766 (2002). If the burden is placed on the plaintiff to rebut a blanket and cursory assertion of sovereign immunity like the one advanced by UKHA, the plaintiff will need to seek limited discovery to obtain the evidence necessary to sustain her burden. But if the burden is placed on the defendant, the defendant will put forth its

---

[5] At oral argument, UKHA contended a plaintiff could obtain evidence on these matters through an open records request. Aside from whether the average pro se litigant could successfully navigate the open records request process, we doubt a plaintiff, counseled or pro se, would pursue an open records request for information the party could obtain through limited discovery. And, as discussed next, placing the burden on the entity asserting arm-of-the-state status, rather than requiring limited discovery, advances one of the primary goals of sovereign immunity.

16

evidence with its motion, potentially obviating the need for discovery. And if discovery is avoided, the district court may resolve the motion raising the sovereign immunity issue more quickly, giving an entity entitled to sovereign immunity the benefits of immunity sooner.

Fourth, assigning the burden to the entity asserting it is an arm of the state is consistent with our precedent assigning the burden in a similar sovereign immunity context. Within the context of the Foreign Sovereign Immunities Act ("FSIA") and the right of a foreign sovereign to assert immunity from suit, we have held the foreign sovereign bears the initial burden of making a prima facie showing of immunity, and a burden of rebutting evidence presented by a plaintiff to overcome that prima facie showing. *Southway v. Cent. Bank of Nigeria*, 328 F.3d 1267, 1271 (10th Cir. 2003). Indeed, other courts have found the assignment of the burden in the foreign sovereign immunity context instructive when placing the burden on the entity asserting sovereign immunity under the Eleventh Amendment. *Woods*, 466 F.3d at 238; *ITSI T.V. Prods., Inc.*, 3 F.3d at 1292.

For these four reasons, and given the weight of persuasive authority, we conclude the burden falls on UKHA to establish it is an arm of the state and, therefore, entitled to sovereign immunity. In concluding the burden in this case falls on UKHA, we recognize but dispel two countervailing points.

First, our precedent allows a district court to raise Eleventh Amendment sovereign immunity sua sponte. *U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 942 (10th Cir.

17

2008); *see also Colby v. Herrick*, 849 F.3d 1273, 1276–78 (10th Cir. 2017) (raising arm-of-the-state issue within sovereign immunity sua sponte); *Elam Const., Inc. v. Reg. Transp. Dist.*, 129 F.3d 1343, 1345 (10th Cir. 1997) (raising sovereign immunity sua sponte where defendant contended it was an arm of the state and not a citizen for purposes of 42 U.S.C. § 1983 action). On the surface, the ability of a court to raise an issue sua sponte cuts against placing a burden on the party who might raise a defense of entitlement to immunity. However, although a district court may raise the issue sua sponte, "it is not obligated to do so." *Burlbaw*, 548 F.3d at 942. Consistent with this discretion, a district court may properly *raise and resolve* the sovereign immunity issue sua sponte where judicially noticeable evidence clearly resolves an entity's arm-of-the-state status and entitlement to sovereign immunity. But a district court should refrain from *resolving* the sovereign immunity issue, without evidence from the parties, where judicially noticeable evidence on the *Steadfast* factors points in different directions. Further, in instances of conflicting evidence from judicially noticeable sources, if the district court opts to *raise* the sovereign immunity issue sua sponte, the burden remains with the entity that would benefit from arm-of-the-state status. Under this framework, a court's ability to sua sponte raise sovereign immunity where an arm-of-the-state analysis is required is preserved and operates in harmony with the burden falling on the entity where the *Steadfast* factors point in conflicting directions based solely on judicially noticeable evidence.

18

Second, an arm-of-the-state determination not only implicates sovereign immunity but may also impact whether the district court has subject matter jurisdiction over the cause of action. Ms. Hennessey, in advancing only a state law claim for negligent supervision, relied exclusively on diversity jurisdiction to bring her action in federal court. "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a). Meanwhile, "a State is not a 'citizen' for purposes of diversity jurisdiction" and, by extension, an "arm or alter ego of the State" is also not a citizen of a state. *Moor v. Alameda Cnty.*, 411 U.S. 693, 717 (1973). Thus, if UKHA is an arm of the state, then it is not a citizen of Kansas for purposes of diversity jurisdiction and Ms. Hennessey cannot satisfy the "citizens of different States" requirement of § 1332(a).

It is well established that "[i]t is incumbent upon the plaintiff properly to allege the jurisdictional facts, according to the nature of the case." *McNutt v. Gen. Motors Acceptance Corp. of Ind., Inc.*, 298 U.S. 178, 182 (1936). This includes the "party invoking diversity jurisdiction bear[ing] the burden of proving its existence." *Middleton v. Stephenson*, 749 F.3d 1197, 1200 (10th Cir. 2014). From this, one might conclude that even though the burden is on UKHA to prove it is an arm of the state for purposes of sovereign immunity, the burden is on Ms. Hennessey to establish UKHA is not an arm of the state for purposes of subject matter jurisdiction. But the burden on the plaintiff to establish jurisdiction does not extend this far. Rather, once the plaintiff sufficiently

alleges and adequately supports that an entity was created in and principally operates within a state, the plaintiff has met her burden and the burden shifts to the entity to demonstrate it is an arm of the state. We reach this conclusion in part because, like in the sovereign immunity context, it is the defendant, not the plaintiff, that possesses the evidence essential to the arm-of-the-state inquiry. *Cf. ITSI T.V. Prods., Inc.*, 3 F.3d at 1292. Furthermore, although the Supreme Court has stated sovereign immunity "partakes of the nature of a jurisdictional bar," *Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 476 n.6 (1987) (quoting *Edelman v. Jordan*, 415 U.S. 651, 678 (1974)), courts have already shifted the burden to the defendant on the arm-of-the-state inquiry in the sovereign immunity context such that it is natural to also do so where the identical inquiry impacts the diversity-of-citizenship basis for subject matter jurisdiction. Finally, placing a burden on the entity claiming arm-of-the-state status is similar to the placement of burdens in the foreign sovereign context, where the FSIA provides the "exclusive source of jurisdiction for claims against foreign states or their instrumentalities," but the "'foreign state [must] make[] a prima facie showing of immunity'" and may be required to "meet its ultimate burden of proving that [an exception allowing for suit] does not apply." *Southway*, 328 F.3d at 1271 (quoting *Gen. Elec. Capital Corp. v. Grossman*, 991 F.2d 1376, 1382 (8th Cir. 1993)).

For these reasons, we conclude the burden is on the entity asserting it is an arm of the state, both for purposes of sovereign immunity and for purposes of an attack on a

prima facie showing of diversity jurisdiction. We now turn to whether UKHA met its burden.

### D.    *UKHA did not Meet its Burden and Remand is Required*

Review of UKHA's memorandum in support of its motion to dismiss and its reply brief on its motion to dismiss clearly demonstrates UKHA did not even attempt to meet its burden. Neither document so much as identified the four *Steadfast* factors, no less cited evidence relevant to the factors or analyzed the factors. All UKHA did before the district court was cite to the University of Kansas Hospital Authority Act.

Under the framework discussed earlier, a district court may sua sponte raise and resolve the arm-of-the-state inquiry only where judicially noticeable evidence clearly resolves the inquiry. This is not such a case. While the Act may provide a sufficient basis to resolve two of the *Steadfast* factors—the state's characterization of UKHA and UKHA's focus on matters of state-wide concern—in favor of UKHA being an arm of the state, it does not support such a conclusion on the finances factor or, as we discuss later, the autonomy factor. Accordingly, we assume the state's characterization of UKHA and UKHA's focus on state-wide concerns support the district court's decision and address only the *Steadfast* factors we conclude weigh against the district court's ruling.

### 1.    Finances Factor

In considering the finances factor a court must look to "the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf." *Steadfast Ins. Co.*, 507 F.3d at 1253; *see also Sikkenga*,

472 F.3d at 721 (considering whether the bulk of an entity's operating funds come from its own revenues or from the state). The inability of an entity to levy taxes, combined with its receipt of all or most of its funding from the state, will serve as a strong indicator that the entity is an arm of the state. *Duke*, 127 F.3d at 980. Likewise, if an entity cannot levy taxes *and* its ability to issue bonds is subject to state review or state procedures, this is also an indicator that the entity is an arm of the state. *Sturdevant*, 218 F.3d at 1170. Conversely, an entity's ability to generate its own revenue so as not to need financial assistance from the state supports a finding that the entity is not an arm of the state. *Hess*, 513 U.S. at 45. Finally, we consider the existence, or lack thereof, of regulations on how an entity may handle its finances and whether the entity's funds are "classified as 'public funds.'" *Steadfast Ins. Co.*, 507 F.3d at 1254 (quoting Okla. Stat. tit. 82, § 861A(A)).

Without evidence of UKHA's financing and revenue streams we are unable to fully assess the factor. But what we do know from the text of the University of Kansas Hospital Authority Act supports the conclusion that UKHA is not an arm of the state. The "Findings, purpose" provision of the Act indicates the hospital needed to have a means of earning revenues necessary for operation so as "to remain economically viable to earn revenues necessary for its operation and to engage in arrangements with public and private entities" and to compete with private healthcare providers. Kan. Stat. Ann. § 76-3302(a)(6). From a more concrete perspective, the Act gives the board of UKHA authority to set the salary of employees, including the president, and to decide whether to provide supplemental benefits for employees.

Kan. Stat. Ann. §§ 76-3304(l), (m), 76-3308(a)(14), 76-3311(a). UKHA also has the power to "borrow money . . . and pledge all or any part of [its] assets therefor." Kan. Stat. Ann. § 76-3308(a)(6). And UKHA may make loans to corporations, partnerships, associations, joint ventures, and other entities. Kan. Stat. Ann. § 76-3308(e).

The Act also gives UKHA wide authority to open and maintain bank accounts. For instance, the Act, when describing UKHA's powers and duties, instructs that UKHA has the power to "deposit moneys of [UKHA] in any banking institution within or without the state or in any depository authorized to receive such deposits, one or more persons to act as custodians of the moneys of [UKHA]." Kan. Stat. Ann. § 76-3308(a)(12). Similarly, a later provision of the Act states:

> all moneys of [UKHA] shall be deposited in one or more bank or trust companies in one or more special accounts. All banks and trust companies are authorized to give security for such deposits if required by [UKHA]. *The moneys in such accounts shall be paid out on a warrant or other orders of the treasurer of [UKHA]* or any such other person or persons as [UKHA] may authorize to execute such warrants or orders.

Kan. Stat. Ann. § 76-3308(f) (emphasis added). From these provisions, it is clear the legislature envisioned that UKHA would have its own funds and would manage those funds outside of the state treasury.

Evidencing the rather obvious fact that UKHA generates revenues, the Act authorizes UKHA to hire one or more "collection services provider[s]." Kan. Stat. Ann. § 76-3308(h). And, UKHA has the ability to control the amount of revenue it generates in

23

that it has the power to "fix, revise, charge and collect rates, rentals, fees and other charges for services or facilities furnished by or on behalf of [UKHA]," without the affixing of said rates being subject to supervision or regulation by the state. Kan. Stat. Ann. § 76-3308(a)(15).

Even if UKHA's ability to generate revenues and control those monies was insufficient for the finance factor to counsel against an arm-of-the-state finding, UKHA additionally has seemingly unconstrained authority to issue bonds. An entire section of the University of Kansas Hospital Authority Act addresses the issuance of bonds, with the lead provision stating that UKHA

> has the power and is authorized to issue from time to time [UKHA's] *bonds in such principal amounts as the authority determines to be necessary to provide sufficient funds for achieving any of [UKHA's] corporate purposes*, including the payment of interest on bonds of [UKHA], the establishment of reserves to secure such bonds, refunding any outstanding bonds and all other expenditures of [UKHA] incident to and necessary or convenient to carry out its corporate purposes and powers.

Kan. Stat. Ann. § 76-3312(a)(1) (emphasis added). In managing the bonds, the UKHA board is tasked with (1) selecting a "bond financing team, including bond counsel and bond underwriter . . . , to provide all professional services required to the bond issuance," Kan. Stat. Ann. § 76-3312(b)(2); (2) pledging any part of UKHA's revenues and/or assets to secure the bond, Kan. Stat. Ann. § 76-3312(c); (3) limiting "the purpose to which the proceeds of sale of bonds may be applied and pledging such proceeds to secure the payment of the bonds," *id.*; (4) limiting "the issuance of

24

additional bonds" or the terms of additional bonds, *id.*; and (5) limiting "the amount of moneys to be expended by [UKHA]," *id.*

It is also abundantly clear that any bond issued by UKHA is the sole responsibility of UKHA and not backed by the State of Kansas. Specifically, a provision of the Act says that "every issue of [UKHA's] bonds shall be *obligations of [UKHA] payable out of any revenues or moneys of [UKHA]*." Kan. Stat. Ann. § 76-3312(a)(2) (emphasis added). More explicitly showing a division between UKHA and the state relative to bonds, the Act says that "[n]either the state of Kansas nor the regents shall be liable for bonds of [UKHA], and such bonds shall not constitute a debt of the state or of the regents." Kan. Stat. Ann. § 76-3312(n). The same provision requires that a statement to this effect be printed on the face of any bond issued by UKHA. *Id.* Reciprocally, the state has pledged that it "will not limit or alter the rights . . . vested in [UKHA] to fulfill the terms of any agreements made with [bond] holders . . . or in any way impair the rights and remedies of such holders until such bonds [are fully paid and discharged]." Kan. Stat. Ann. § 76-3312(q). And, somewhat like with the state's disclaimer of liability, the board is authorized to print language to this effect on the face of any bond it issues. *Id.*

Against this weighty and voluminous evidence that UKHA generates revenue, controls its own finances, and can issue bonds, UKHA presents two less persuasive arguments. First, UKHA argues its financial structure supports an arm-of-the-state finding because it cannot levy taxes. But, under our precedent, an entity's inability to

25

levy taxes is emblematic of it being an arm of the state only if the entity also cannot

issue bonds without state oversight and cannot generate its own revenue. *Sturdevant*,

218 F.3d at 1169–1170; *Duke*, 127 F.3d at 980. Accordingly, UKHA's inability to

levy taxes is of minimal weight in the calculus.

Second, UKHA notes it is subject to reporting and review requirements. It is

true that an entity being subject to reporting and auditing requirements favors an arm-

of-the-state finding. *Steadfast Ins. Co.*, 507 F.3d at 1254–55. And the Act does

require UKHA to submit financial information for review to various state actors, in

that UKHA

> shall submit to the regents, the governor and the legislature within six
> months after the end of the fiscal year a report which shall set forth a
> complete and detailed operating and financial statement of [UKHA]
> during such year. Also included in the report shall be comprehensive
> information regarding all audit reports performed in such year.

Kan. Stat. Ann. § 76-3312(p). But we are unpersuaded this consideration is capable

of swinging the finance factor in favor of an arm-of-the-state finding given the

extensive latitude the Act provides UKHA regarding the management of its finances,

its ability to generate revenue, and its ability to issue bonds.[6] This is particularly true

where local governmental entities that do not benefit from sovereign immunity, such

as counties, also must make their financial information available for public

---

[6] Additionally, it is debatable whether the requirement that an entity report its
finances falls within the finances factor rather than the autonomy factor, which we
discuss next. *See Steadfast Ins. Co.*, 507 F.3d at 1254–55 (discussing auditing and
reporting requirements as part of autonomy factor).

26

inspection. *See* Kan. Stat. Ann. §§ 12-866(b); 19-26,105(c), (d); 19-228(b); 19-3521.

Thus, without any evidence in the record demonstrating UKHA receives subsidies,

not to be confused with revenue streams, from the State of Kansas, the finances

factor cuts against UKHA being an arm of the state.[7] This conclusion alone is

sufficient to vacate the district court's grant of UKHA's motion to dismiss and

remand so the parties might submit evidence on the *Steadfast* factors.

**2.     UKHA's Reliance on *Sturdevant* is Misplaced**

To overcome this conclusion, UKHA attempts to rely upon *Sturdevant*. There,

we indicated a court may conclude an entity is an arm of the state where there is

ambiguity regarding the entity's legal liability for judgment but other factors all favor

an arm-of-the-state conclusion. *Sturdevant*, 218 F.3d at 1166, 1171. Three things

distinguish the present case from *Sturdevant*. First, as discussed, the text of the

University of Hospital Kansas Authority Act supports the conclusion that the

finances factor favors a finding that UKHA is not an arm of the state.

Second, even if one were to determine the factor was neutral, such a

conclusion would still require remand. From an evidentiary standpoint, in *Sturdevant*,

---

[7] In discussing the finances factor, the district court cited a provision of the Act allowing UKHA to receive compensation for services it provided to the University of Kansas Medical School in the training of medical students and for patient care services to indigent Kansas citizens. It is not apparent how these revenue streams differentiate UKHA from a private hospital that contracts with the state and provides like services. The proper focus is on whether the state provides financial assistance to and subsidizes the entity. *See Hess*, 513 U.S. at 45 (discussing the financial solvency of an entity and its ability to generate its own revenue). Thus, the ability to generate these revenues cuts in favor of financial autonomy, not against it.

the ambiguity regarding the liability for any judgment arose from the presentation of conflicting evidence, not from the absence of evidence. *Id.* at 1165–66. Thus, the entity asserting it was an arm of the state attempted to meet its burden. Here, there is no reason to conclude ambiguity exists regarding UKHA's finances where UKHA merely failed to present any evidence on the subject.[8]

Third, and most problematic for UKHA's reliance on *Sturdevant*, exercising de novo review, we are unable to concur with the district court's assessment that, based exclusively on the language of the University of Kansas Hospital Authority Act, the autonomy factor favors UKHA being an arm of the state. We begin by providing a brief overview of how to approach the autonomy factor. We then apply that analysis, relying on six considerations apparent from the text of the Act.[9]

---

[8] If the absence of evidence permitted a finding of ambiguity, we would incentivize an entity that bore liability for any judgment against it and with finances independent of a state to demur from presentation of evidence on these matters, especially in situations where the entity is in possession of the evidence. To avoid this perverse incentive, if the entity with the burden fails to present evidence of its finances and legal liability, and the judicially noticed evidence is unclear, the factor counts *against* the entity being an arm of the state.

[9] The considerations we discuss are (1) control of the entity by the governor and legislature, (2) classification of the entity's employees, (3) the entity's ownership and control over property, (4) the entity's ability to form contracts, (5) the entity's ability to set policies, and (6) the ability of the entity to sue and be sued. These considerations are not an exhaustive list, just those that other courts have relied upon when analyzing the autonomy factor and that are apparent from the present record evidence.

### a.    *Autonomy factor basics*

The autonomy factor is the most complex of the four factors because it spans a broad range of considerations. In analyzing this factor, a court must remain cognizant that some ties and oversight will always remain between the state and an entity created by the state. *Takle v. Univ. of Wis. Hosp. & Clinics Auth.*, 402 F.3d 768, 771 (7th Cir. 2005). This is true even where it was the state's intent to privatize an entity. *See id.* To this point, the Seventh Circuit, when considering a very similar set of circumstances as those underlying the formation and operation of UKHA, pointedly opined,

> [t]he strings that tie the hospital to the state are found in many cases in which a state decides to privatize a formerly state function. They do not require the privatization be treated as a farce in which the privatized entity enjoys the benefits both of not being the state and so being freed from the regulations that constrain state agencies, and of being the state and so being immune from suit in federal court.

*Id.*

### b.    *Autonomy factor considerations*

#### i.    Control of entity by governor & legislature

Turning to specifics, a common consideration in analyzing the autonomy factor is the role the state executive branch, specifically the governor, and the state legislature play in the operations of the entity. *See id.* at 770; *see also Steadfast Ins. Co.*, 507 F.3d at 1254; *Fresenius Med. Care Cardiovascular Res., Inc.*, 322 F.3d at 71–72; *Sturdevant*, 218 F.3d at 1168–69. In many cases involving entities asserting arm-of-the-state status, the governor and legislature respectively appoint and confirm

members of the board that oversees the entity, and this structure weighs against the entity's autonomy from the state. *Steadfast Ins. Co.*, 507 F.3d at 1254; *Fresenius Med. Care Cardiovascular Res., Inc.*, 322 F.3d at 71–72; *Sturdevant*, 218 F.3d at 1169. However, "the power to appoint is not the power to control." *Takle*, 402 F.3d at 770. As such, this is but one consideration and a governor's appointment power is not sufficient to establish that the autonomy factor favors an arm-of-the-state finding. *Fresenius Med. Care Cardiovascular Res., Inc.*, 322 F.3d at 71. Rather, courts also look at (1) the ability of the governor to remove appointees, *Steadfast Ins. Co.*, 507 F.3d at 1254; *Fresenius Med. Care Cardiovascular Res., Inc.*, 322 F.3d at 71; and (2) the governor's power to block or veto action taken by the board of the entity, *Hess*, 513 U.S. at 44; *Fresenius Med. Care Cardiovascular Res., Inc.*, 322 F.3d at 72.

While the district court concluded this consideration favored UKHA not being autonomous from the state, we conclude the consideration produces mixed results that favor a finding of autonomy. The board governing UKHA is composed of nineteen members, of which thirteen were appointed by the governor and confirmed by the legislature at UKHA's inception. Kan. Stat. Ann. § 76-3304(b). However, the Act greatly curtails the governor's discretion in appointments after selection of the first board. This is because, upon a vacancy on the board, the appointment of a new member is a two-step process, with the board identifying two or three candidates from whom the governor must select when making an appointment to fill the vacancy. Kan. Stat. Ann. § 76-3304(e). Thus, while the governor had wide-ranging

appointment power at UKHA's inception, that power contracted long ago. Additionally, nothing in the Act gives the governor any authority to remove a member of the board. Rather, that function is expressly left to the board itself. Kan. Stat. Ann. § 76-3304(j). Furthermore, although the governor appoints the majority of board members, the Act leaves it to the board to select its leadership and to form committees. Kan. Stat. Ann. § 76-3304(g). Likewise, the Act tasks the board, not the governor, with power to "appoint a president who shall serve at the pleasure of the board" and "as the chief executive officer of [UKHA]." Kan. Stat. Ann. § 76-3304(l); *see also* Kan. Stat. Ann. § 76-3308(a)(14). And, interestingly, taking the mantra of "the power to appoint is not the power to control" a step further, *Takle*, 402 F.3d at 770, it is the president, not the board, who "shall direct and supervise administrative affairs and the general management of [UKHA]," Kan. Stat. Ann. § 76-3304(l). Thus, the governor determines neither who among the board members leads the board nor the individual in charge of overseeing the day-to-day operations of UKHA. Accordingly, we disagree with the district court's conclusion that this consideration supports a finding that UKHA is under the control of the state.

      ii.     Classification of employees

Another common consideration within the autonomy factor is how employees of the entity are classified, including whether they are "state" employees, whether they *must* partake in state retirement and benefit programs, and whether they are

31

subject to a state merit system for purposes of hiring.[10] *Steadfast Ins. Co.*, 507 F.3d at 1254; *see also Takle*, 402 F.3d at 771 (noting that employees remained "state employees" but not counting this consideration significantly against autonomy where the structure was established only to *permit* employees to take part in retirement system); *cf. Fresenius Med. Care Cardiovascular Res., Inc.*, 322 F.3d at 64 (hypothesizing that entity might gain advantage in employment market if it is not an arm of the state and subject to state regulations and systems on hiring and firing of employees and benefits). This consideration favors a finding of autonomy.

In multiple places, the University of Kansas Hospital Authority Act explicitly declares that employees of the hospital and UKHA "shall not be considered state employees" both for purposes of the Act and for purposes of any other state law or regulation. Kan. Stat. Ann. § 76-3303(h); *see also* Kan. Stat. Ann. § 76-3303(n) ("A [UKHA] employee shall not be considered to be a state employee, as such term is defined in this act or in any other statute or regulation."). Likewise, the Act instructs that "nothing . . . shall be construed as placing any officer or employee of [UKHA] in the classified or unclassified service under the Kansas civil service act." Kan. Stat. Ann. § 76-3311(b). And rather than placing UKHA in existing state benefit programs and subjecting them to the state merit hiring system, the Act leaves discretion to the

---

[10] The district court never discussed the classification of employees when analyzing the autonomy factor.

UKHA board to create these programs and systems and to set the terms of employment, stating that UKHA

> may employ such employees as it may require and *upon such terms and conditions as it may establish*. [UKHA] shall *establish personnel, payroll, benefit and other such systems as authorized by the board . . . .* [UKHA] shall *determine the qualifications and duties of its employees* subject to any statutes concerning licensure, certification or registration under state law. The board *shall develop and adopt policies and procedures that will afford its employees grievance rights*, *ensure that employment decisions shall be based upon merit and fitness* or applicants and shall prohibit discrimination because of race, religion, color, sex, or national origin.

Kan. Stat. Ann. § 76-3311(a) (emphasis added). The Act also delegates additional discretion to the board relative to the establishment of retirement benefits for employees hired after the transfer of the hospital from the regents to UKHA, permitting the board to either (1) affiliate with the state retirement system or (2) create an independent retirement system for UKHA employees. Kan. Stat. Ann. § 76-3322. Accordingly, the Act largely treats UKHA like a private hospital when it comes to hiring, firing, managing, and providing benefits for its employees.

The Act's classification and parameters for UKHA hiring and managing employees have all the hallmarks of UKHA being autonomous. And, through its brief on appeal, UKHA does not identify a single provision of the Act contradicting this conclusion. Nor have we located any such provision. Accordingly, consideration of the classification of employees strongly favors a finding of autonomy.

### iii.    Ownership & control of property

A third consideration in the autonomy factor analysis is whether the entity has ownership and control over property. *Steadfast Ins. Co.*, 507 F.3d at 1254; *Takle*, 402 F.3d at 771. Unlike the prior two considerations, this consideration demonstrates a degree of control by the state over UKHA and favors UKHA being an arm of the state.

As a starting point, nothing in the University of Kansas Hospital Authority Act transfers ownership of any of the buildings or facilities in which UKHA operates from the University of Kansas to UKHA. This, on its own, might not be of great significance, as "[m]any private entities operate on public land or in public buildings," including clearly private commercial entities like "concessionaires in airports." *Takle*, 402 F.3d at 771. However, UKHA also has no hope of ever owning any *new* buildings or facilities because the Act instructs that even if UKHA finances the construction of buildings and facilities, "the buildings and facilities constructed shall become the property of Kansas upon completion and acceptance by the secretary of administration." Kan. Stat. Ann. § 76-3308a(a). Moreover, UKHA is not free to undertake the construction of new buildings or facilities or to repair or renovate existing buildings and facilities without first obtaining approval from the state board of regents and the secretary of the administration at the University of Kansas. Kan. Stat. Ann. § 76-3308a(a)–(b). To add to the web of oversight and state control over buildings and facilities, the board of regents may not approve any capital

improvement proposed by UKHA without consulting with the State Building

Construction Joint Committee. *See id.* Thus, when it comes to the most tangible and

valuable property, UKHA lacks autonomy.

Provisions of the Act governing UKHA's control over intangible property and

over tangible and real properties that are not buildings or facilities take a generally

different tack. The Act envisioned properties of this nature might be transferred from

the University of Kansas to UKHA on the date that responsibility for operation of the

hospital was transferred from the regents to UKHA.[11] Kan. Stat. Ann. § 76-3309(a).

Of more consequence and certainty, the Act gives UKHA the power to

> *purchase, lease, trade, exchange, or otherwise acquire, maintain, hold,*
> *improve, mortgage, sell, lease and dispose of personal property,*
> whether tangible or intangible, and any interest therein; and to
> *purchase, lease, trade, exchange or otherwise acquire real property or*
> *any interest therein, and to maintain, hold, improve, mortgage, lease*
> *and otherwise transfer such real property*, so long as such transactions
> do not conflict with the mission of the authority as specified in th[e] act.

Kan. Stat. Ann. § 76-3308(a)(7) (emphasis added). Likewise, UKHA has the power

to "acquire space, equipment, services, supplies and insurance necessary to carry out

the purposes of th[e] act." Kan. Stat. Ann. § 76-3308(a)(11). The board has additional

powers to regulate the use of property, in that the Act tasks it with "develop[ing]

policies and procedure generally applicable to the procurement of goods, services and

---

[11] The Act goes on to say that "[a]ny disputes that arise in the transfer of property from the university to [UKHA] shall be resolved by the governor." Kan. Stat. Ann. § 76-3309(d). This provision demonstrates a degree of control by the state, indicating UKHA might be an arm of the state, as a typical dispute over property would be resolved through judicial channels.

construction." Kan. Stat. Ann. § 76-3308(a)(9). And the board is tasked with the power to "establish policies and procedures regarding . . . the use, occupancy or operation of any [UKHA] facility," with said policies and procedures "*not . . . subject to supervision or regulation* by any commission, board, bureau or agency of the state." Kan. Stat. Ann. § 76-3308(a)(15) (emphasis added).

Overall, while the legislature's decision not to transfer existing buildings and facilities to UKHA may not be surprising, UKHA's inability to own buildings and facilities it constructs with funds from its revenues cuts against UKHA having autonomy from the state. And while UKHA has authority over other types of property, its authority here is not so vast as to swing the consideration against an arm-of-the-state conclusion.

### iv.    Ability to form contracts

Another consideration, albeit one discussed with less frequency, is an entity's ability to form its own contracts with government entities and commercial enterprises. *Sikkenga*, 472 F.3d at 719–20. This consideration overwhelmingly favors UKHA having autonomy from the state because the University of Kansas Hospital Authority Act contains at least five separate provisions giving the board and UKHA power to form contracts without approval or oversight from the state or any state agency. First, the "Findings, purpose" section of the Act indicates that, to provide the desired level of care, the hospital needed freedom "to engage in arrangements with public and private entities." Kan. Stat. Ann. § 76-3302(a)(6). Second, the Act grants

36

UKHA the power to "develop policies and procedures generally applicable to the procurement of goods [and] services," Kan. Stat. Ann. § 76-3308(a)(9), which naturally implicates the formation of contracts with commercial entities. Third, the Act delegates to UKHA the power to "*contract for* and to accept any gifts, grants and loans of funds, property, or any other aid." Kan. Stat. Ann. § 76-3308(a)(10) (emphasis added). Fourth, the Act also delegates to UKHA the power to "participate in joint ventures with individuals, corporations, governmental bodies or agencies, partnerships, associations, insurers or other entities to facilitate any activities or programs." Kan. Stat. Ann. § 76-3308(c). Fifth, and directly to the point, the Act grants UKHA the broad and unregulated power to

> *make and execute contracts*, *guarantees or any other instruments and agreements* necessary or convenient for the exercise of its powers and functions including, *without limitation*, to make and execute contracts with hospitals or other health care businesses to operate and manage any or all of the hospital facilities or operations and to incur liabilities and secure the obligations of any entity or individual.

Kan. Stat. Ann. § 76-3308(a)(5) (emphasis added).

Similar to the classification-of-employees consideration, UKHA's brief on appeal does not identify a single statutory provision placing any direct limit or any state oversight on UKHA's ability to enter into contracts. And our review of the Act identifies no such provision. Accordingly, consideration of UKHA's ability to form contracts strongly supports a finding that UKHA is autonomous from the state.

v.    Ability to set policies

An entity's ability to set its own policies, without oversight and control from the state or a state agency, is instrumental in the entity being autonomous from the state. *Sikkenga*, 472 F.3d at 720. Conversely, if day-to-day operations of an entity were controlled by the state, autonomy would almost certainly not exist. The University of Kansas Hospital Authority Act unambiguously provides UKHA unrestricted power to set policies governing its day-to-day operations. For instance, UKHA has the power to "establish policies and procedures regarding any services rendered for the use, occupancy or operation of any [UKHA] facility" and the policies established are "not to be subject to supervision or regulation by any commission board, bureau or agency of the state." Kan. Stat. Ann. § 76-3308(a)(15). Similarly, the Act grants to the board of UKHA the power to "adopt, repeal and amend such rules, procedures and bylaws, not contrary to law . . ., as it deems expedient for its own governance and for the governance and management of [UKHA]." Kan. Stat. Ann. § 76-3304(k). And, as noted earlier, the president, who is selected by and serves at the pleasure of the board, is tasked with supervising and managing UKHA's affairs. Kan. Stat. Ann. § 76-3304(l). If these three provisions do not demonstrate UKHA's control over its own affairs free of state oversight, a fourth provision definitively does. Under the provision of the Act entitled "Cessation of regents' authority of hospital operations," UKHA assumed full control of the hospital upon its creation, with the provision stating, "[f]ollowing the creation of [UKHA]

38

and on the transfer date under th[e] act, the regents shall have no further control over, or responsibility for the operation of the university of Kansas hospital." Kan. Stat. Ann. § 76-3310. In sum, the consideration regarding the power to set policies and control the day-to-day operation of the hospital strongly favors UKHA being autonomous.[12]

> vi.  Ability to bring suit on own behalf

A final consideration courts have looked at is the ability of the entity to sue and be sued, with the existence of such ability supporting a finding that the entity is autonomous. *Sikkenga*, 472 F.3d at 719; *see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 804 F.3d 646, 668 (4th Cir. 2015); *cf. Daniel v. Univ. of Tex. SW Med. Ctr.*, 960 F.3d 253, 259 (5th Cir. 2020) (considering whether an entity can sue or be sued as a standalone fifth factor rather than as part of the autonomy analysis). Here, the University of Kansas Hospital Authority Act directly speaks to this consideration as UKHA "shall have all the powers necessary to carry out the purposes and provision of th[e] act, including, without limitation, the [power] to . . . sue and be sued in its own name." Kan. Stat. Ann. § 76-3308(a). Indeed, UKHA has

---

[12] The only limitation on UKHA's ability to set its own policies involves the performance of abortions in UKHA's facilities as the Act instructs that "no abortion shall be performed, except in the event of a medical emergency, in any medical facility, hospital or clinic owned, leased or operated by [UKHA]." Kan. Stat. Ann. § 76-3308(i). Viewed in totality with the otherwise unlimited and unregulated control vested in UKHA regarding use and operation of the hospital and associated facilities, this one carveout carries little weight in the context of an autonomy and arm-of-the-state analysis.

been a party in over a dozen suits before the Kansas Court of Appeals. *See e.g.*, *Univ. of Kan. Hosp. Auth. v. Bd. of Cnty. Comm'rs of Franklin Cnty.*, 469 P.3d 806 (Kan. Ct. App. 2020); *Clayton v. Univ. of Kan. Hosp. Auth.*, 388 P.3d 187 (Kan. Ct. App. 2017); *Univ. of Kan. Hosp. Auth. v. Bd. of Cnty. Comm'rs of Wyandotte Cnty.*, 313 P.3d 60 (Kan. Ct. App. 2013); *Univ. of Kan. Hosp. Auth. v. Yang*, 293 P.3d 816 (Kan. Ct. App. 2013) (unpublished table decision); *Univ. of Kan. Hosp. Auth. v. Bd. of Comm'rs of Cnty. of Wabaunsee*, 251 P.3d 673 (Kan. Ct. App. 2011) (unpublished table decision). Accordingly, this consideration favors a finding of autonomy.

### vii.  Totality of considerations

When viewing the considerations together, we conclude the autonomy factor, based only on the language of the University of Kansas Hospital Authority Act, favors concluding that UKHA is an autonomous entity and not an arm of the state. Alternatively, at best, this factor is neutral for UKHA's arm-of-the-state position. The considerations surrounding the classification of employees, the ability to form contracts, the ability to establish policies and govern day-to-day affairs without interference from the state, and the ability to sue all unquestionably favor autonomy. Meanwhile, the remaining two considerations—control by the governor and legislature and ownership of property—have mixed analyses, with some aspects favoring a finding of autonomy and other aspects countenancing against such a finding. Furthermore, the aspects weighing against a finding of autonomy are ones on which other courts, when analyzing whether a healthcare provider was an arm of the

state, have placed limited importance. *See Takle*, 402 F.3d at 771 (observing that there will always be strings between state and entity created by the state and downplaying importance of state owning property used by entity); *see also Oberg*, 804 F.3d at 672 (placing minimal weight on annual reporting requirement placed on entity); *Fresenius Med. Care Cardiovascular Res., Inc.*, 322 F.3d at 71–72 (concluding entity autonomous and not arm of the state even though governor had wide authority to appoint board members). Therefore, we conclude this is not a case where an entity asserting arm-of-the-state status can overcome uncertainty regarding its finances. As a result, the approach we employed in *Sturdevant* is inapplicable.

### E.    Summation & Disposition

As discussed above, we conclude the burden was on UKHA to present evidence and argument demonstrating it is an arm of the state. UKHA failed to meet this burden. Although the district court attempted to undertake that burden it erred in conducting sua sponte review of the University of Kansas Hospital Authority Act because, applying the *Steadfast* factors, (1) the finances factor appears to weigh against an arm-of-the-state conclusion; (2) any uncertainty regarding UKHA's finances weighs against UKHA's position given it bore the burden; and (3) de novo review of the Act supports the conclusion UKHA is autonomous from the state such that UKHA could not overcome any uncertainty regarding the finances factor.

This leads us to the appropriate disposition and to how the litigation should proceed on remand.[13] We could reverse the district court's grant of UKHA's Federal Rule of Civil Procedure 12(b) motion to dismiss and remand for UKHA to file an answer. Instead, for two reasons, we take a slightly different approach and merely vacate the district court's order so it might receive evidence from UKHA on remand and reevaluate whether UKHA is an arm of the state. First, such an approach is more efficient where UKHA could renew the gist of its arm-of-the-state argument through a Rule 12(c) motion. *See* Fed. R. Civ. P. 12(h) (providing that challenges to subject matter jurisdiction may be raised at any time). Second, requiring UKHA to first file an answer before being permitted to further pursue its arm-of-the-state argument could subject UKHA to unnecessary litigation in the event it can muster evidence that it is entitled to sovereign immunity. And delaying proceedings on UKHA's arm-of-the-state defense tilts against basic principles of fairness where we had not previously held the burden fell on the entity asserting it is an arm of the state. Accordingly, on remand, UKHA may opt to renew its Rule 12(b) motion or to file an answer so the

---

[13] UKHA argues that even if we disagree with the district court's arm-of-the-state analysis, Ms. Hennessey failed to plead the elements of diversity of citizenship. This argument is without merit, particularly in light of Ms. Hennessey's pro se status when filing her federal complaint. Ms. Hennessey alleged she is a citizen of Missouri and UKHA is "a corporate entity established by law that operates the hospital located at 4000 Cambridge Street, Kansas City, Kansas 66106" and "a Kansas corporation and/or entity operating a hospital located in Kansas City, Wyandotte County, Kansas." ROA at 6–7. These allegations, taken as true and liberally construed, permit the conclusion that UKHA is incorporated in and has a principal place of business in Kansas, a state diverse from Ms. Hennessey's residence in Missouri.

case may proceed to the next step in litigation.[14] If UKHA renews its Rule 12(b) motion, the district court should employ the two-step process discussed earlier, first considering the four structural factors from *Steadfast* and then, if those factors point in different directions, considering the twin aims of sovereign immunity. *See Hess*, 513 U.S. at 47; *Fresenius Med. Care Cardiovascular Res., Inc.*, 322 F.3d at 65; *Duke*, 127 F.3d at 978.

### III.    CONCLUSION

We VACATE the district court's order granting UKHA's motion to dismiss and REMAND for further proceedings consistent with this opinion.

---

[14] If UKHA *renews* its Rule 12(b) motion, the motion shall be limited to the subject matter jurisdiction and sovereign immunity grounds raised in the earlier Rule 12(b) motion. Our vacatur and remand does not provide UKHA the opportunity to restart Rule 12(b) proceedings and advance new Rule 12(b) theories for dismissal.